LOCAL 771, I.A.T.S.E., AFL–CIO, Plaintiff-Appellee-Cross-Appellant,

v.

RKO GENERAL, INC., WOR DIVISION, Defendant-Appellant-Cross-Appellee.

No. 617, Docket 76–7430.

United States Court of Appeals, Second Circuit.

Argued Jan. 6, 1977.

Decided March, 3, 1977.

Howard N. Meyer, New York City, for plaintiff-appellee-cross-appellant.

L. Robert Batterman, New York City (Franklin S. Bonem, Jonathan L. Sulds, Proskauer Rose Goetz & Mendelsohn, New York City, of counsel), for defendant-appellant-cross-appellee.

---

1. The district court is reported at 419 F.Supp. 553.

2. The engineers at WOR are members of the International Alliance of Theatrical State Em-

Before MANSFIELD, GURFEIN and MESKILL, Circuit Judges.

MANSFIELD, Circuit Judge:

Both sides appeal from a decision [1] by Judge Milton Pollack of the Southern District of New York confirming an arbitrator's ruling that a demand for arbitration by Local 771, I.A.T.S.E., AFL–CIO ("Local 771") is time-barred under the arbitration clause of the Union's collective bargaining agreement ("the Agreement") with RKO General, Inc., WOR Division ("the Company"), and holding that Local 771's work-assignment suit against the Company could continue over the Company's claim that arbitration is the Union's exclusive remedy under the Agreement. We affirm the district court's confirmation of the arbitrator's award, and reverse its finding on the issue of the exclusivity of arbitration. Accordingly, we order that the action be dismissed.

The controversy giving rise to this case was triggered when the Company announced its decision, on February 21, 1975, to use portable television cameras known as minicams in place of film cameras to cover local events for its daily news broadcasts and to assign the operation of the minicams to its studio engineers [2] ("the engineers"), with the result that it proposed to terminate, effective February 25, 1975, two film editors represented by Local 771 as well as several film cameramen, soundmen, and lighting technicians represented by other locals. Prior to 1970, when the Company first decided to broadcast a daily news report, its programming consisted entirely of studio productions and transmission of predetermined events from remote locations. These productions were videotaped or broadcast live through the use of large, pedestal television cameras and were electronically edited. The engineers performed both the camera work and the electronic editing.

ployees and Moving Picture Machine Operators, AFL–CIO, but do not belong to a local.

In 1970 the Company purchased 16 mm. film cameras and sound and lighting equipment to cover local, fast-breaking news events for its nascent daily news program. Members of Local 771 were hired to edit the film for broadcast after it was returned to the station and developed.[3]

The development of the minicam units fundamentally changed the coverage of local news. The minicams are portable, hand-held television cameras with a 22–pound powerpack. The minicam has a built-in microphone which automatically adjusts to sound levels, it rarely needs the assistance of outside lighting due to its great light sensitivity, and it produces videotape which needs no developing and can be electronically edited for broadcast, erased, and reused. The Company's decision to introduce this streamlined news production process led to the termination of Local 771's film editors as well as the cameramen, soundmen and light technicians. On the basis of their experience with video-tape cameras and electronic editing, the Company assigned the newsgathering and electronic editing functions to members of the engineers.

Litigation immediately ensued. On February 21, 1975, Local 771 (film editors) and Local 644, which represents film cameramen, filed the instant suit in the district court. Local 771 sought an order compelling multilateral arbitration of the dispute, equitable relief against the Company, back pay and damages. On February 26, 1975, Local 771 amended its complaint by deleting its request for multilateral arbitration and seeking bilateral arbitration with the Company.[4]

On February 25, 1975, members of Local 771 and the other affected unions began picketing the Company, which immediately filed an unfair labor practice charge alleging violations of § 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4).[5] On April 10, 1975, at the request of the

---

3. The interpretive problems posed by Local 771's collective bargaining agreement can be illustrated as follows: Under Article 3.01 of the Agreement, a TV editor is defined as "a person whose duties consist of re-editing film . . . for transmittal over television channels; who may edit film in assembling a news show." The definition is qualified to the extent that "In no event shall it be necessary for the Employer to engage personnel from more than one local union to edit or re-edit video tape or other television recordings."

In Article 3.04 a "Film Editor shall be deemed to mean a person who exercised creative judgment in actually cutting or selecting, arranging in continuity, revising, or correcting all elements of motion picture film. . . . At no time, however, shall he be permitted to perform the duties presently being performed by the WOR News Department, which include the re-editing of any and all types of shows and the editing and re-editing of news film."

Finally, in Article 18 the scope of the Agreement is extended to "All employees engaged in the re-editing and/or cutting and/or assembling of positive film prints and/or negative film. . . . The scope of this Agreement shall also include the foregoing work functions whether made on or by film, tape or otherwise, and whether produced by means of motion picture cameras, electronic cameras or devices, tape devices or any combination of the foregoing, . . . "

4. The reasons for Local 771's amendment of its complaint are unclear, although it appears to have been done in reaction to the International's decision, set out in the amended complaint, not to oppose the locals' claim to the work, and apparently ordering the engineers to comply therewith. 419 F.Supp. at 556.

5. "(b) It shall be an unfair labor practice for a labor organization or its agents—

* * * * * *

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

* * * * * *

"(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work: . . . "

National Labor Relations Board ("NLRB"), Judge Charles Brieant of the Southern District of New York granted a preliminary injunction against the picketing. The NLRB held four days of hearings to determine the underlying jurisdictional dispute pursuant to § 10(k) of the Act, 29 U.S.C. § 160(k).

On August 18 the NLRB decided the dispute in favor of assignment of the news-gathering and electronic editing functions to the engineers. Although it found that Local 771 had sought all of the editing functions from the outset, the Board distinguished between mechanical (electronic) and "judgmental" editing, the latter being characterized as "determining which material is to be retained for the program and which is to be edited out . . . ", and disclaimed jurisdiction over the latter on the grounds that the dispute over which it had jurisdiction involved only the work assigned by the Company to the engineers, which in turn embraced only the mechanical aspects of editing. In October 1975 the NLRB issued a formal unfair labor practice complaint against the Unions, which acquiesced in the decision, and the NLRB subsequently relinquished jurisdiction.

On January 12, 1976, Local 771 filed a formal demand for bilateral arbitration of the judgmental editing issue in accordance with rules of the American Arbitration Association. An arbitrator, Eric J. Schmertz, was appointed and held a hearing on March 31, 1976. On April 9, 1976, he rendered his "Opinion and Award," finding the dispute non-arbitrable for the reason that the formal demand was time-barred under Article 15.02 of the Agreement which provides that, "Arbitration must be resolved ninety (90) days after the occurrence of the event. . . ." The arbitrator found that the "event" in question was the February 25, 1975, termination of Local 771's employees,

and that Local 771's filing of the federal court action could not be deemed a demand for arbitration under Article 16.01 of the Agreement, which incorporates by reference the rules of the American Arbitration Association ("AAA").[6]

On June 4, 1976, Local 771 moved in district court for an order setting aside the arbitration award and compelling arbitration. The Company moved for confirmation of the award and for an order dismissing the action. Local 771 argued that the dispute was multilateral, that the 90–day time bar was therefore inapplicable, that the action before the NLRB tolled the arbitration period, that the Company's refusal to arbitrate estopped it from asserting the time bar, and that the Board's decision declining jurisdiction over the issue of judgmental editing amounted to a new "event" which arose only after the NLRB decision distinguished between mechanical and judgmental editing. Judge Pollack confirmed the arbitrator's interpretation of the time-bar provision as incorporating the AAA demand procedures, with which Local 771 had admittedly failed to comply. In addition, the district court found that the NLRB proceedings had not barred concurrent arbitration, that the Company's reluctance to submit to court-ordered arbitration did not preclude its pleading the time-bar, and that the arbitrator had not unreasonably interpreted the dispute over judgmental editing to be "merely a refinement" of the original "event" and therefore time-barred. 419 F.Supp. at 558–59.

The district court, however, denied the Company's motion to dismiss on the ground that arbitration was the exclusive remedy under the contract. Judge Pollack interpreted the arbitration provision as merely an optional remedy, relying on Article 15.02 of the Agreement, which provides that "if no mutually satisfactory adjustment is

---

**6.** Section 7 of the Rules of the American Arbitration Association provides for the initiation of arbitration upon notice to the other party "which notice shall contain a statement setting forth the nature of the dispute, the amount involved, if any, the remedy sought," and for

the filing at any Regional Office of the AAA two copies of said notice, together with two copies of the arbitration provisions of the contract, together with the appropriate administrative fee.

reached [through the grievance procedure] then either party shall have the right to refer the matter to arbitration . . . ," and Article 16.01, which provides that "The parties may submit to arbitration in accordance with the rules of the American Arbitration Association. . . . " Said Judge Pollack, "Neither provision grants anything but an option to proceed to arbitration and neither can be termed 'mandatory' or 'exclusive' . . . ." 419 F.Supp. at 560.

The Company appealed from so much of the district court's decision as refused to dismiss the action. The Union cross-appealed from the court's order confirming the arbitrator's award and refusing to order arbitration to proceed on the merits. The Union also moved to dismiss the Company's appeal on the ground that the order was interlocutory.

## DISCUSSION

*Appealability*

■ The threshold question is whether we have jurisdiction over the Company's appeal from the district court's order which, being interlocutory, does not ordinarily qualify for appeal as a "final" order under 28 U.S.C. § 1291. Its appealability therefore turns on whether it satisfies the conditions laid down by the Supreme Court in *Cohen v. Beneficial Ind. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), for appeal in certain exceptional cases from interlocutory orders determining collateral or separable rights that are "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated," 337 U.S. at 546, 69 S.Ct. at 1226. We are satisfied that this order meets the *Cohen* criteria.

The interpretation of the arbitration provisions of the collective bargaining agreement presents an issue that is separable from and collateral to the main issue in the case, which is whether the employees who are members of Local 771 are entitled to be assigned to newsgathering and editing functions in the operation of minicam units. Under analogous circumstances we have held that an issue regarding the right to trial in a different forum is separable from and collateral to the merits for purposes of applying the *Cohen* rule. *CAB v. Aeromatic Travel Corp.* 489 F.2d 251 (2d Cir. 1974) (whether CAB had primary jurisdiction held appealable). See also *Local 438 Construction & General Laborers Union, AFL-CIO v. Curry*, 371 U.S. 542, 548–50, 83 S.Ct.531, 9 L.Ed.2d 514 (1963); *Mercantile National Bank v. Langdeau*, 371 U.S. 555, 558, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963) (involving Supreme Court review under 28 U.S.C. § 1257).

The Company's claim that the district court's decision violates the national labor policy in favor of minimum judicial intervention and exclusivity of arbitration conducted under the terms of labor agreements, see *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), unquestionably presents an important question, the gravity of which is emphasized by the similarity of the arbitration provision in the Agreement at issue to the "standard form," see *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *Bonnot v. Congress of Independent Unions Local No. 14*, 331 F.2d 355 (8th Cir. 1964).

Finally, the Company's right to be relieved of the costs and delays of trial, which it claims to have gained through the contract's arbitration provisions, will be lost irretrievably if proceedings in the case go forward in the district court. This case is analogous to *United States v. Beckerman*, 516 F.2d 905 (2d Cir. 1975), where we recognized that an immediate appeal was essential to protect and enforce the defendant's claim, based on double jeopardy grounds, to be free from any further proceedings in the district court, rather than ultimately to gain a judgment in his favor after further protracted proceedings. See also *Weilbacher v. J. H. Winchester & Co.*, 197 F.2d 303 (2d Cir. 1952). This claim, which appears to be more than merely colorable in the

present case, distinguishes the case from a run-of-the-mill attempted piecemeal appeal from a denial of a motion to dismiss, which is not appealable for the reason that the appellant may prevail at trial or ultimately be vindicated upon appeal from an adverse final judgment. Accordingly, we uphold the Company's right to appeal under the *Cohen* rule, and as a matter of economy and efficiency will entertain Local 771's cross-appeal.[7]

*The Merits*

The first issue to be decided is whether the district court erred in refusing to vacate the award or to order arbitration on the merits of Local 771's claim, for if Judge Pollack's resolution of this issue were to be set aside, it would be unnecessary to determine whether arbitration was the exclusive remedy.

 Whatever might be our interpretation of the 90-day time-bar provision of the parties' contract, it is settled that we may not overturn the arbitrator's interpretation unless it fails "to draw its essence" from the agreement, *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), or is vulnerable because of fraud, corruption, misconduct, action in excess of the arbitrator's powers, complete disregard of the applicable law, or some ground specified in 9 U.S.C. § 10. *Bell Aerospace Co. v. Local 516*, 500 F.2d 921, 923 (2d Cir. 1974).

> "[T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It was the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960).

This self-imposed limitation on the court's role in the resolution of labor disputes under collective bargaining agreements providing for arbitration is no less applicable because the arbitrator's award may have turned upon the failure of one party to abide by the procedural prerequisites to arbitration under the contract. *John Wiley & Sons v. Livingston*, 376 U.S. 543, 557, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). We long ago recognized that our limited role in reviewing arbitration awards is necessary to preserve the bargained-for purpose of arbitration, which is the avoidance of litigation and its concomitant costs and delays. *Amicizia Societa Navegazione v. Chilean Nitrate and Iodine Sales Corp.*, 274 F.2d 805 (2d Cir.), *cert. denied*, 363 U.S. 843, 80 S.Ct. 1612, 4 L.Ed.2d 1727 (1960). Thus, an award will not be set aside for a mistaken application of the law; only where there is a "disregard" of the law will the court interfere. *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1214 (2d Cir. 1972).

 Faced with these well established principles, Local 771 argues that the arbitrator's decision in this case is so unfair and so "hypertechnical" that it amounts to "arbitral misconduct" in "total and absolute disregard" of (1) the multilateral nature of the dispute; (2) the Company's "obstruction" of arbitration; (3) the NLRB's jurisdiction in the matter; and (4) the effect of the lower court injunction issued at the request of the NLRB. At first blush these arguments have some appeal, since Local 771 has never obtained a decision on the merits with respect to the issue left undecided by the NLRB in its § 10(k) proceeding and the effect of the arbitrator's award was to deprive Local 771 of such a decision even though it, immediately upon termination of its film editors in February 1975, sought multilateral arbitration by court order, which was followed by the NLRB's assumption of jurisdiction pursuant to § 10(k) of the Act and Judge Brieant's issuance of a preliminary injunction. In this context

---

7. Since the outcome of our review of the Company's claim mandates dismissal of the case, Local 771's cross-appeal is thus from a final

determination of the rights of the parties and squarely within § 1291.

Local 771 may well have concluded that it was unnecessary to press for bilateral arbitration under the Agreement since it expected that all issues would be resolved by the NLRB, an expectation that was not fulfilled. Regardless of Local 771's motives or strategy, however, each of the excuses asserted by it now for failure to file a timely request for arbitration was available to it when it argued before the arbitrator and was necessarily rejected in the arbitrator's opinion, to which there is no requirement that each issue be addressed as long as the result is not in disregard of the law or the terms of the contract. *Wilko v. Swan,* 346 U.S. 427, 436, 74 S.Ct. 182, 98 L.Ed. 168 (1953); *Sobel v. Hertz, Warner & Co., supra,* 469 F.2d at 1214. We fail to find any such disregard in the arbitrator's opinion here.

■ Local 771 contends that a demand for arbitration within 90 days as required by the Agreement would have been a useless gesture for the reason that, in view of the multilateral nature of the dispute, the proper procedure was to seek a resolution of the issue by the district court or the NLRB. Bilateral arbitration, argues Local 771, would have been stayed by the arbitrator pending termination of the court proceeding or the § 10(k) proceeding, or both. The proper course, however, was to serve a demand for arbitration within 90 days of the termination of its members and place squarely before the arbitrator the issue of whether the dispute must be resolved under the terms of the contract or deferred until termination of the other pending proceedings. Nothing barred Local 771 from taking this course. Furthermore, within a few days after filing this lawsuit Local 771 amended its complaint to exclude the issue of multilateral arbitration from consideration by the district court, limiting its request to bilateral arbitration. Thereafter it chose not to request bilateral arbitration under the Agreement until the NLRB decision left one issue to be resolved. Since Local 771 freely and for strategic reasons of its own chose not to seek appropriate resolution of the "multilateral" issue, the arbitrator was well within his powers under the Agreement to decide that the arbitration demand was untimely.

■ Nor did the Company's alleged resistance to arbitration constitute a valid excuse for Local 771's failure to demand arbitration under the Agreement. The Agreement's arbitration provision, clearly contemplating that one party might refuse to assent to a demand for arbitration, would become operative upon a timely demand by "either party." Article 16.04, moreover, provides that an arbitrator's award made in the absence of one of the parties "shall have the same force and effect as if both parties were present." Had the arbitrator determined that the dispute was multilateral, the Company's absence might have been excused, but this would not excuse Local 771's failure to seek bilateral arbitration within 90 days of the "event," which the arbitrator reasonably identified as the February 25, 1975, termination of Local 771's film editors.

■ The NLRB's assumption of jurisdiction over the dispute presented in the § 10(k) proceeding likewise did not provide a legal excuse for Local 771's failure to demand arbitration under the Agreement. Section 10(k) of the National Labor Relations Act, 29 U.S.C. § 160(k), which confers jurisdiction on the Board to decide such disputes, provides that the underlying charges "shall be dismissed" upon "voluntary adjustment" of the suit. Moreover, where the § 10(k) issues are not identical with those in arbitration and the Board will decide a different phase of the same dispute, arbitration is nonetheless encouraged because "the weight of the arbitration [upon the Board's decision] is likely to be considerable." *Carey v. Westinghouse Corp.,* 375 U.S. 261, 271, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964). Thus, a rational basis existed for the arbitrator's application of the procedural requirements of the Agreement in the present case and his finding that the contractual time period for a demand for arbitration was not tolled by the NLRB proceeding.

We find no support, either in logic or in the policies underlying labor relations, for Local 771's argument that its timely invocation of arbitration would have been in contempt of Judge Brieant's injunction of April 10, 1975, which enjoined Local 771 and the other unions from picketing at WOR–TV offices or inducing strikes by WOR employees or secondary boycotts by the Company's suppliers of goods or services and prohibited "threatening, coercing, or restraining" the Company where an "object thereof is to force or require WOR–TV . . . to assign or cause the assignment of the operation of videotape cameras for newsgathering to employees who are members or represented by respondents." The injunction remained in effect until November 28, 1975, when the NLRB withdrew its complaint.

While there may be circumstances in which an attempted *enforcement* of an arbitration award during the pendency of a temporary injunction granted pursuant to an NLRB jurisdiction dispute may be construed as "coercive," see, e. g., *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778, 802 (5th Cir. 1973), the mere invocation of such proceedings could not be so construed. On the contrary, such action indicates a willingness to resolve disputes peacefully without force or coercion, which is to be encouraged. *Carey v. Westinghouse Corp.*, *supra*, 375 U.S. at 266, 84 S.Ct. 401.

Lastly, Local 771 argues that the effect of the NLRB's decision, which resolved all issues except judgmental editing, was to create a new grievance, limited in scope, which amounted to a new "event" within the meaning of the Agreement, starting the 90-day period running from November 17, 1975, instead of February 21, 1975. However, the Company's job assignment decision which gave rise to the dispute, including its termination of Local 771's editors and any failure to assign judgmental functions to it, occurred in February, not in November. Although the record is unclear as to whether the Local 771 advanced its present "new dispute" argument to the arbitrator, his decision finding that the "event" occurred on February 21, 1975, implicitly rejected such a contention. No reason is shown why Local 771 could not or, indeed, did not claim judgmental editing in February 1975.

Thus, although there may have been sound practical reasons for Local 771's strategy, including its impression that an early request for bilateral arbitration would be futile and that the NLRB might resolve all issues in the § 10(k), we cannot ignore those Supreme Court decisions, grounded upon a strong policy favoring arbitration, which prohibit interference with the arbitrator's award. Accordingly we hold that the district court's decision, insofar as it refused to set aside the arbitrator's opinion and award, must be upheld.

*Exclusivity of Arbitration*

in determining whether arbitration of the dispute between Local 771 and the Company was the exclusive remedy available to a party with a grievance, we look first, of course, to the terms of the Agreement. It provides that the parties will promptly attempt to adjust all disputes or grievances involving interpretation or application of its terms and that "no other matters shall be subject to arbitration" (Art. 15.01). If the grievance procedure does not resolve the dispute "then either party shall have the right to refer the matter to arbitration as herein provided" (Art. 15.02). The Agreement then provides (Art. 16.01):

"16.01 The parties may submit to arbitration in accordance with the rules of the American Arbitration Association upon written request of either party, provided, however, that by mutual agreement the parties may agree to the selection of an arbitrator through other than the regular American Arbitration Association selection process.

\*　　\*　　\*　　\*　　\*　　\*

"16.03 The decision of the Arbitrator shall be binding upon both parties for the duration of this Agreement."

■ The district court construed the foregoing language as giving each party a choice between "the right" to invoke arbitration or resort to the courts. We disagree. Neither the word "may" nor any other language used in the Agreement implies that the parties had the option of invoking some remedy other than arbitration. The Agreement is clear that the parties relegated themselves to arbitration in accordance with the rules of the American Arbitration Association as the sole remedy, subject only to the possibility that an arbitrator might be selected through some other mutually-agreed upon process. The sole option an aggrieved party retained through use of the word "may" was to abandon its claim. To hold that the parties impliedly reserved the right to litigate their grievances in the courts, absent mutual waiver or recision of the arbitration clauses, would in effect treat their agreement to arbitrate as a useless gesture and there would be little or no reason to provide, as does Art. XVI of the Agreement, that "The decision of the Arbitrator shall be binding upon both parties for the duration of this Agreement."

Our construction of these provisions has strong support. In *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1963), the Supreme Court held that an arbitration clause providing that any dispute which could not be settled through a grievance procedure "may be submitted" to arbitration, which it described as the "standard form" for the submission of "all disputes" to an arbitrator, 363 U.S. at 565, 80 S.Ct. 1345, left the district court "confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract."

In *Bonnot v. Congress of Indep. Unions, Local # 14*, 331 F.2d 355 (8th Cir. 1964), the court ordered dismissal of an action filed in the district court on the ground that arbitration was the parties' only remedy under a collective bargaining agreement providing that "either party may request arbitration" after an unsuccessful resort to the grievance procedures, stating:

"The result claimed to follow is that the arbitration here is not mandatory. We think the result is necessarily the other way. The obvious purpose of the 'may' language is to give an aggrieved party the choice between arbitration or the abandonment of its claim." 331 F.2d at 359.

Similarly in *Gangemi v. General Electric Co.*, 532 F.2d 861, 866 (2d Cir. 1976), we recently found an arbitration provision covering disciplinary penalties to be "concededly mandatory" which provided that disputes "may be submitted to arbitration by either party."

In light of these authorities and the language of the Agreement, there can be no question but that the arbitration clause in the case at bar was intended to foreclose resort to the district court for determination of a dispute concerning the interpretation of the Agreement. Since arbitration was the exclusive remedy under the Agreement it becomes unnecessary to decide whether, if it were not, Local 771 lost any right to seek relief in court by proceeding to arbitration.

In view of the district court's lack of power to determine the merits of the dispute which the arbitrator has held to be untimely under the Agreement, the case must be dismissed.