**CERES MARINE TERMINALS, INC.,**
**Plaintiff-Appellant,**

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, LOCAL 1969, AFL–CIO, et al., Defendants-Appellees.**

**No. 81–1085.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1982.

Decided July 22, 1982.

Philip S. Dallosto, Lord, Bissell & Brook, Chicago, Ill., for plaintiff-appellant.

Fred W. Grady, Merrillville, Ind., for defendants-appellees.

Before WOOD and POSNER, Circuit Judges, and WILL,* Senior District Judge.

\* The Honorable Hubert L. Will, Senior Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. The collective bargaining agreement at issue here was in effect from January 1, 1978 through December 31, 1980. The work slow-down of which Ceres complains allegedly began on June 9, 1980, and ended on June 19, 1980.

WILL, Senior District Judge.

Ceres Marine Terminals, Inc. ("Ceres" or "the Company"), alleges that employees at its Burns Waterway Harbor in Portage, Indiana, engaged in a work slow-down in violation of the collective bargaining agreement [1] ("the Agreement") between Ceres and the International Longshoremen's Association ("the Union"). Ceres also alleges that the Union encouraged the slow-down, again in violation of the Agreement, and that the slow-down caused Ceres to incur damages totaling $38,000. Ceres filed an action [2] for damages in the state court, and the Union removed it to the United States District Court for the Northern District of Indiana.

The district court stayed further proceedings pending arbitration of Ceres' complaint. The court determined that Ceres' claim was a "grievance" which the Agreement required Ceres to submit to arbitration before bringing a civil action (based on that grievance) in the courts. Ceres appeals from that decision which stayed further proceedings pending arbitration, and the sole issue is whether, under the Agreement entered into by Ceres and the Union, arbitration is a prerequisite to Ceres' filing of a civil action whose basis is an alleged violation of the Agreement by the Union or its members. We affirm.

It is axiomatic that the analysis of whether a dispute between the parties to a collective bargaining agreement must be submitted to arbitration starts with the collective bargaining agreement itself. "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America*

2. Ceres originally filed two separate actions in the state court. It first sought a temporary restraining order and a preliminary injunction. A week later, Ceres filed a separate action for damages. Soon thereafter, its request for injunctive relief became moot, and Ceres amended its initial complaint to request only monetary damages.

*v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). Our function is therefore confined to ascertaining whether the particular claim is governed by the parties' collective bargaining agreement. *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346–1347, 4 L.Ed.2d 1403 (1960). However, even where a collective bargaining agreement is ambiguous regarding the effect of its arbitration provisions, doubts should be resolved in favor of arbitration. *Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. at 1352–1353; *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 377–78, 94 S.Ct. 629, 636–637, 38 L.Ed.2d 583 (1974).

Section 14.2 of the Agreement defines "grievance" as

a complaint, dispute or controversy in which an employee or the Union claims that the Company has failed to carry out a provision of this Agreement and which involves a question concerning the effect, interpretation, application of or claim of breach or violation of this Agreement.

This section is worded in terms of complaints, disputes, or controversies presented by "an employee or the Union," and does not, viewed in isolation, contemplate the possibility of a "grievance" which might be presented by the Company. However, section 14.5 states that "[t]he Company may present a grievance." The Agreement does not provide a separate definition of "Company Grievances."

Section 14.3 of the Agreement establishes a three-step grievance procedure which is

preliminary to arbitration.[3] This preliminary procedure consists of informal negotiations between various representatives of the Union and the Company. If the grievance is not resolved in this manner within a period of approximately nine "working calendar days" then the grievance "may be referred to arbitration."

Section 14.5 provides for a less extensive procedure preliminary to the arbitration of a "company grievance:"

[The Company's] grievance may be presented orally or in writing to the Terminal Steward or the Recording Secretary of the Union and the Union shall give a written answer thereto within three (3) working calendar days after presentation thereof. In the event the answer is unsatisfactory or if no answer is timely received, the Company may refer the grievance to arbitration by written notice of appeal to the Union.

The agreement recognizes that certain kinds of "complaints, disputes or controversies" are of extraordinary importance. These "extraordinary grievances" are "any strike, work stoppage, picketing, slow-down, sit-down, or other interruption of work," section 16.1, any endorsement or encouragement by the Union of any of these variations of an "interruption of work," *id.*, and any lockout by the Company. Section 16.3.

Section 16.4 of the Agreement provides an "Additional Procedure" (which, as will become apparent, would be more appropriately entitled "Alternative Procedure") should one of the parties present any of the

---

**3.**  14.3 Procedure: In the event the Company and the Union should be unable to agree upon the disposition or settlement of any grievance the employees will continue to work and such grievance shall be handled in the following manner:

Step One. An employee having a grievance shall refer it to his Terminal Steward who shall discuss the grievance with the Company supervision within one (1) working calendar day of its occurrence. If the matter is not satisfactorily adjusted within twenty-four (24) hours after the discussion with the Company supervision, it goes to—

Step Two. The grievance shall be discussed by a designated representative of the

Union and a designated representative of the Company within three (3) working calendar days after discussion with the Company supervision. If a satisfactory answer is not received, it goes to—

Step Three. The grievance shall be reduced to writing within two (2) working calendar days after receipt of the Company's answer in Step Two, shall set forth the facts regarding the alleged grievance and shall be signed by the aggrieved employee. If a satisfactory written answer is not received within two (2) working days after presentation of the written grievance, it may be referred to arbitration.

extraordinary grievances which sections 16.1 and 16.3 specify:

In the event of a violation of Paragraph 16.1 hereof, in addition to any other remedy, the Company may file a grievance regarding such violation by telegraphic notice thereof to the Union and to the American Arbitration Association, which latter shall immediately, upon receipt of the telegraphic notice, appoint an arbitrator to hear the matter. The American Arbitration Association shall appoint an arbitrator who is immediately available. The arbitrator shall hold a hearing forthwith, upon telegraphic notice to the Company and the Union, and in such event, shall have jurisdiction to issue a cease and desist order with respect to such violation. No opinion shall be required, but only a written award and order by the arbitrator. It is agreed that such award and order may be immediately confirmed without notice to any other interested person or party by any court of competent jurisdiction upon the motion, application or petition of the Company. The same procedure shall be applicable in the event of a violation of Paragraph 16.3 by the Company.

Section 16.4 allows Ceres, when confronted with a work slow-down, to dispense with the preliminary grievance procedure which section 14.5 provides for more general and less urgent "company grievances."[4] Instead, it may proceed immediately to arbitration, and to an expedited summary arbitration at that.[5] The final sentence of section 16.4 makes this expedited procedure available to the Union, allowing it to bypass the preliminary and time-consuming

process of section 14.3, in the event of a lockout by the Company.

Ceres argues that although the Union and its members' grievances—whether they are of an ordinary or extraordinary nature—must be referred to arbitration, and cannot be brought in the courts in any form other than as actions to confirm or vacate an arbitrator's award,[6] arbitration of its own grievances, again whether ordinary or extraordinary, is an optional rather than a mandatory procedure under this Agreement. Ceres relies primarily upon section 14.5. It argues that the language "[t]he Company may present a grievance . . ." and "the Company may refer the grievance to arbitration. . ." is permissive and gives Ceres a choice between arbitration and immediate filing of a civil action. Additionally, Ceres argues, the language of section 16.4 regarding expedited arbitration ("the Company may file a grievance") is similarly "permissive."

Ceres contends that an inference that arbitration is mandatory only for grievances filed by the Union or its members can be drawn from section 14.1. That section states:

[t]he Union and the employees agree that the grievance and arbitration procedures provided herein are adequate to provide a fair and final determination of all employee and Union grievances which may arise during the term of this Agreement and that such procedures shall be the exclusive remedy for the enforcement *by them* of this Agreement. [Emphasis added.]

4. It is not evident from either the Agreement or the parties' briefs what grievances the Company might present which are not covered by the terms of section 16.1. Nor were counsel able to illuminate this matter at oral argument. At a minimum, however, we can infer from the terms of section 14.5 that Ceres contemplated that it either might have reason to present a "complaint or dispute" which could not be classified under any of the terms of section 16.1 or might sometimes have relatively insignificant section 16.1 grievances which did not justify resort to the expedited procedure of section 16.4.

5. A party that initiates arbitration pursuant to section 16.4 avoids the procedures which section 15.2 provides for the selection of an arbitrator, and the hearing and presentation of evidence contemplated by section 15.6.

6. Section 15.3 of the Agreement makes the arbitrator's decision "final and binding on the Company and Union, the employees covered by this Agreement and upon any person involved or affected thereby."

The Agreement does not contain a similar provision in which Ceres agrees that the Agreement's grievance and arbitration procedures are its exclusive remedy for enforcement of its rights under the Agreement.

Ceres' second and related argument hinges upon further language in section 16.4. That section states that its expedited arbitration procedure is "in addition to any other remedy" possessed by the Company. Ceres argues that unless the Agreement is interpreted as giving it the option of arbitration or the immediate filing of a civil action the language "in addition to any other remedy" is meaningless. Ceres contends that its only other option is abandonment of its claim, and that "to abandon one's claim is no remedy." Appellant's Brief at 11 & footnote.

■ That a collective bargaining agreement uses the word "may" or other facially "permissive" language in establishing arbitration procedures does not necessarily give a party to that agreement the option of either submitting its claim to arbitration or by-passing arbitration and seeking immediate recourse to the courts. *United Steelworkers of America v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1279 (3d Cir. 1979); *Local 771, I.A.T.S.E. v. RKO General, Inc.*, 546 F.2d 1107, 1116 (2d Cir. 1977); *J. C. Bonnot v. Congress of Independent Unions Local # 14*, 331 F.2d 355, 359 (8th Cir. 1964) (Blackmun, J.). In *RKO General*, the Second Circuit rejected a Union's argument that a collective bargaining agreement, whose provision for arbitration of disputes was at least as "permissive" as the analogous provisions of the *Ceres* Agreement, permitted it to choose between arbitration and resort to the courts. 546 F.2d at 1115–16. The Second Circuit concluded that

> [n]either the word "may" nor any other language used in the Agreement implies that the parties had the option of invoking some remedy other than arbitration. . . . The sole option an aggrieved party retained through use of the word "may" was to abandon its claim.

*Id.* at 1116, *paraphrasing Bonnot*, 331 F.2d at 359 (Blackmun, J.).

Our agreement with the Second, Third, and Eighth Circuits that the word "may" does not necessarily give a party its choice between arbitration and resort to the courts is not inconsistent with our decision in *Teledyne Wisconsin Motor v. Local 283, UAW*, 530 F.2d 727 (7th Cir. 1976). In *Teledyne*, we determined that use of the word "may" in the collective bargaining agreement at issue in that case did not compel the Union to permit Teledyne to submit its complaint (that the Union had orchestrated a concerted refusal by Teledyne's employees to work overtime while some employees remained laid off) to binding arbitration. Central to our decision in *Teledyne* were the *exclusive* employee-orientation of the arbitration provisions in the *Teledyne* collective bargaining agreement, 530 F.2d at 732, and the absence of any "no-strike" clause in that agreement. *Id.* at 729. That *Teledyne* is not applicable here merely reflects material differences between the terms of the *Teledyne* collective bargaining agreement and the *Ceres* Agreement.

Interestingly, the ubiquitous word "may" also appears in section 14.3 of the *Ceres* Agreement, in connection with that section's outline of procedures for the Union's grievances. Nonetheless, Ceres asserts, and the Union concedes, that any grievance presented by the Union or its members must be either submitted to arbitration or dropped if the grievance is not resolved through the steps preliminary to arbitration. The parties also agree that should the Union complain of a lockout by the Company, the Agreement does not give it a choice between arbitration and resort to the courts even though the same "permissive" language of section 16.4, upon which Ceres relies for its claim to immediate access to the courts, is made applicable to the Union when it complains of a lockout.

The Third Circuit's discussion in *Fort Pitt, supra*, of a similar "heads I win, tails you lose" interpretation of a collective bargaining agreement's arbitration provisions is remarkably on point:

The problem with the Company's approach is that the parts of the Agreement dealing with the grievance procedures applicable to employees also use the permissive word "may." Yet, the Company asserts that the grievance mechanism is obligatory for the Union. If, as Fort Pitt contends, the grievance procedures are indeed mandatory for the Steelworkers despite the permissive language of the Agreement, we cannot say that the district court committed plain error in finding that those procedures are also mandatory for the Company.

598 F.2d at 1279 [footnotes omitted].

■■ *Fort Pitt* and *RKO General* establish that a party to a collective bargaining agreement cannot rest its case for the non-applicability to it of the agreement's arbitration provisions upon the agreement's use of the word "may" or similarly permissive language. *See also Bonnot, supra.* They reaffirm the principle that any exclusion of particular parties or issues from coverage by an agreement's arbitration provisions should not be inferred from the language of the agreement, but must be stated explicitly in the agreement. *See Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. at 1352–1353. We therefore return to the specific arbitration provisions of the *Ceres* Agreement, and consider Ceres' arguments in the context of those arbitration provisions.

The language in section 14.5 that "the Company may refer the grievance to arbitration" is limited by the preceding dependent clause "[i]n the event the answer is unsatisfactory or if no answer is timely received, . . . ." This clause refers to the preliminary procedure for company grievances. The Company presents its grievance to an official of the Union, and the Union has three working calendar days in which to give a written answer to the charge. Only if that answer is "unsatisfactory" or if no answer is timely received *may* the Company refer its grievance to arbitration. The first sentence of section 14.5 ("The Company

may present a grievance.") does no more than entitle Ceres to press its complaints and disputes as "grievances."

Similarly, the language of section 16.4 ("the Company may file a grievance") is limited by the clauses and phrases which surround it. In its context, the phrase "the Company may file a grievance" indicates that when it has an extraordinary grievance, Ceres may arrange telegraphically for immediate arbitration. Additionally, section 16.4 provides that the availability of this expedited arbitration procedure does not deprive Ceres of "any other remedy" available to it. But because Ceres' rights vis-a-vis the Union and its members are governed by the Agreement to which they are parties, the reservation to Ceres of "any other remedy" must be read as "any other remedy guaranteed to the Company by this Collective Bargaining Agreement."

■ Interpreting sections 14.5 and 16.4 as requiring Ceres to submit its grievance to arbitration does not render the language "in addition to any other remedy" meaningless. The Company's option when confronted with a work slow-down, or any other violation of section 16.1, is not limited to "the choice to arbitrate or abandon it's [sic] claim." Appellant's Brief at 11. Its "other remedy" is to submit its grievance to the Terminal Steward or the Recording Secretary (and then proceed to arbitration if the Union's response is unsatisfactory or tardy) in accordance with section 14.5. This is of course a slower and therefore less desirable procedure than the one available under section 16.4, but it is nonetheless a "remedy."

Neither of Ceres' arguments is persuasive when the phrases upon which it relies are read in the context of the sections in which they appear and in relation to the provisions of the other sections which concern grievances and procedures for their arbitration. At best, Ceres has established only that this Agreement[7] was poorly drafted

---

7. While it is irrelevant to our determination as to what the 1978–80 Agreement provided, we note (from the responses of the Union's counsel to our questions at oral argument) that the parties scrubbed up the language of the arbitration provisions in their current collective bargaining agreement. That agreement specifically requires Ceres, as well as the Union and its

and left the nature of Ceres' remedies for its grievances slightly ambiguous. That, however, is insufficient to avoid application of the rule that courts are to construe collective bargaining agreements in favor of arbitration. *See Warrior & Gulf,* 363 U.S. at 582–83, 80 S.Ct. at 1352–1353.

Although ambiguities in the Agreement offer some support for Ceres' contention that it may proceed in the courts without first submitting its complaint to arbitration, a determination that arbitration is a prerequisite to Ceres' filing of its action in the courts is clearly the more plausible interpretation of the arbitration provisions in this Agreement. Even if the scales of plausibility tipped the other way, the principle that doubts must be resolved in favor of arbitration would lead us to conclude that the district court correctly determined the Agreement did not give Ceres a choice between arbitration of its grievance and the immediate filing of a civil action for damages in the courts. The district court's order is therefore Affirmed.

HARLINGTON WOOD, Jr., Circuit Judge, concurring.

I concur in Judge Will's fair and careful analysis of the issue, but not without considerable hesitation. As we are judges, not negotiators for the parties, I fear that we are coming perilously close to rewriting this particular bargaining agreement the way we think it ought to be in order to render its application fair and balanced. But, considering the favor that arbitration enjoys, and the principle of resolving doubts in favor of arbitration, I do concur. It does seem to me, however, that since bargaining agreements are nothing new, the parties should be better able to more clearly express the understanding they themselves reached at the table.

members, to submit grievances to arbitration before seeking any remedy from the courts.