WASHINGTON MAILERS UNION NO. 29, Affiliated with Communications Workers of America, Appellant,

v.

WASHINGTON POST COMPANY, Appellee.

No. 00–7045.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 8, 2000.

Decided Dec. 8, 2000.

Richard Rosenblatt argued the cause for appellant. With him on the briefs was Mark F. Wilson.

Willis J. Goldsmith argued the cause and filed the brief for appellee.

Before: TATEL and GARLAND, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge SILBERMAN.

SILBERMAN, Senior Circuit Judge:

The Washington Mailers Union brought suit in federal district court seeking to compel the Washington Post to arbitrate a dispute concerning the job security provision of the collective bargaining agreement. The court granted the Post's motion for summary judgment. It concluded that the issue was related to an area of management discretion and refused to order arbitration. We reverse.

## I.

The Washington Post publishes a daily newspaper. The Washington Mailers Union No. 29 is the collective bargaining representative of the Post's mailing room employees. The Union represents both mailers, who operate the machinery which collates and places inserts into the newspaper, and helpers, who perform materials-handling functions. When the time for the expiration of the prior collective bargaining agreement neared, the Union and the Post began negotiations, and they entered into a new agreement in 1998. Section 5 of the agreement allows for a grievance to be filed "[w]henever there is a disagreement involving an alleged violation of a specific provision of this Agreement, including a controversy over any form of discipline or discharge." If the

parties cannot resolve the grievance, § 5(d) provides for arbitration, but also limits the arbitrator's authority: "The arbitrator shall not have the authority to amend or modify or to add to or subtract from the provisions of this Agreement, nor shall matters left unrestricted by a specific provision of this Agreement or left to the discretion of the Publisher be subject to arbitration."

Throughout the year, the Post analyzes production needs and other factors to determine the minimum number of "situations" (jobs)[1] for both mailers and helpers needed to handle production volume during the period. After such determinations, the Post provides the Union with a mail-room work schedule (the "mark-up") of available shifts for the designated number of mailers and helpers. The mailers and helpers included in each mark-up, referred to as situation holders, then select their fixed, five-day-a-week schedules in order of seniority. The employees work these schedules for the duration of the mark-up. The Post fills additional labor needs, which vary depending on production and employee absences, with mailer and helper "substitutes." Substitutes are on-call employees to whom the Post offers, on a weekly basis, up to five shifts per week. But substitutes are not guaranteed five shifts a week.

In November 1998, the Post announced a new mark-up, effective January 1999, which reduced the number of helper situations from 144 to 122; the result was that 22 helpers no longer had fixed five-day-a-week schedules. Instead, these employees were offered on "a regular weekly basis, the opportunity to work no fewer than five shifts each week"—which means they would not know in advance their weekly schedule. The Union filed a grievance claiming that this change violated § 6(f)(1), which provides:

All situation holders actively working at The Post as of April 5, 1998 as Mailers

1. The parties agree that a "situation" is a   fixed five-day-a-week work schedule.

or Mailroom Helpers, and whose names appear on the Job Security Rosters attached as Appendices B and C, will be guaranteed regular, fulltime positions as Mailers or Helpers for the term of this Agreement without layoff, unless they vacate the same through retirement, resignation, death, or discharge for cause. . . .

The Union contended that this term-of-contract job security provision guaranteed situations to the then-number of mailers and helpers. It was claimed that 13 of the 22 employees denied situations were among those covered by the guarantee of regular employment under § 6(f)(1).

The Post refused to arbitrate the grievance, maintaining that arbitration of the employer's determination as to the number of situations was expressly precluded by § 13(a). It states:

> The Publisher shall determine the number of regular situations to meet minimum production requirements; provided, the Publisher shall take into consideration the number of extra shifts hired at the Publisher's option due to sickness, vacations, jury duty, compassionate leave, and any other relevant factors. In the event of a dispute arising under this paragraph, the Union may grieve such dispute, but the dispute shall not be subject to arbitration.

The Union countered that the agreement allows for arbitration if a violation of a specific provision of the agreement is alleged, and it claimed that the separate guarantee of "regular" employment in § 6(f)(1) had been violated by denying situations to the 13 covered workers. The Union emphasized that it was not challenging the denial of situations to the nine helpers, designated as substitutes, who were not employed at the time the agreement went into effect and thus not covered by § 6(f)(1). The Union conceded that these nine employees' situations were non-arbitrable under § 13(a) because they were not covered by the specific provision of § 6(f)(1).

The Union brought suit in federal district court under § 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a) (1994), seeking to compel arbitration. The parties stipulated to the facts and filed cross-motions for summary judgment. The district court granted summary judgment for the Post concluding that § 13(a) "unambiguously removes disputes about the number of situations from [arbitration]." The court reasoned that whether § 6(f)(1) guarantees a situation for the 13 covered employees might have been arbitrable *if* § 13(a) did not exist. The Union appealed.

## II.

We review the district court's grant of summary judgment *de novo*. *See Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C.Cir.1992). The determination of whether a dispute is arbitrable under a collective bargaining agreement is a question of law for the court, unless the parties unmistakably agree to submit the issue of arbitrability to arbitration. *AT&T Techs., Inc. v. Communications Workers*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986). But, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *Id.* And if a contract includes an arbitration clause, a presumption of arbitrability arises, meaning "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Id.* at 650, 106 S.Ct. at 1419 (internal quotation marks omitted) (alteration in original) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)).

■ As noted, the Union seeks to compel arbitration of its grievance that the Post violated the specific guarantee of "regular, full-time" employment provided by § 6(f)(1) of the agreement when it denied mark-up situations to 13 employees covered by § 6(f)(1). The Post relies on § 13(a), which it asserts positively excludes this dispute—relating to the number of situations—from arbitration as entirely within the management's discretion. Section 6(f)(1) does not limit this discretion because "regular, full-time positions" does not mean situations.

The Post at the onset argues that the grievance did not really allege violations of § 6(f)(1) but only challenged the number of situations, the very decision precluded from arbitration under § 13(a). The Post relies heavily on the Union's stipulation that the grievance "directly resulted from" and would not have been filed "but for" the Post's decision to reduce the number of situations.[2] But the Union did not challenge the mark-up *per se*, rather its effect on the 13 employees it alleged have superior rights under § (6)(f)(1). The Union's legal claim only arose when those 13 employees were negatively affected. That the mark-up was an anterior cause of the grievance is hardly reason to conclude that the Union's legal claim is focused on the mark-up. That is equivalent to contending that if a union member complained about the situations in the mark-up and was fired for his complaints, he could not grieve his dismissal under a "just cause" provision because his dismissal stemmed from the mark-up.

It is apparent that the underlying dispute really turns on the interpretation of "regular, full-time positions" in § 6(f)(1). The Union claims it means that these 13 employees are entitled to situations;

whereas the Post contends that as long as they are offered any five days in a week that is sufficient. It would appear that the proper interpretation of this section, which resolves the issue in this case, goes to the merits of the grievance and is not for us to decide. As the Supreme Court warned, "the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement ... when the alternative is to utilize the services of an arbitrator." *Warrior & Gulf,* 363 U.S. at 585, 80 S.Ct. at 1354.

■ Nevertheless, the Post contends the argument to send this dispute to the arbitrator is necessarily to give the arbitrator authority to decide arbitrability–a question reserved for the court in this case. To be sure, by interpreting § 6(f)(1), the arbitrator may implicitly decide the arbitrability issue, but that outcome is inherent when the specific rights-based provision of the agreement is tied to the issue of arbitrability and not only to the issue of rights. When such a situation occurs, unless the issue is clearly excluded from arbitration, the interpretation of the rights-based provision should be left to the arbitrator. *Cf. Ceres Marine Terminals, Inc. v. Int'l Longshoremen's Ass'n, Local 1969,* 683 F.2d 242, 244 (7th Cir.1982) ("[W]here a collective bargaining agreement is ambiguous regarding the effect of its arbitration provisions, doubts should be resolved in favor of arbitration.").

Section 13(a) is hardly an unequivocal indication that a grievance filed regarding the meaning of § 6(f)(1) is not arbitrable. Section 13(a) does state that "The Publisher shall determine the number of regular situations to meet minimum production requirements.... In the event of a dispute

---

**2.** The first grievance actually stated that it involved "the recent helper mark-up" because "[t]his mark-up contains a total of 122 jobs which is in violation of 'job security roster section' [6(f)(1)] in the contract" and the second grievance stated that it concerned the employer's violation of § 6(f)(1), which pro-

vides that the designated mailers will be "guaranteed regular, full-time positions," because "[a]s a result of The Post's action in establishing the new mark-up ... employees whose names are on the Job Security Rosters will be laid off from their regular, full-time positions and reduced to substitute status."

arising under this paragraph, the Union may grieve such dispute, but the dispute shall not be subject to arbitration." But § 6(f)(1) specifically provides that "[a]ll situation holders actively working at The Post as of April 5, 1998 as Mailers or Mailroom Helpers, and whose names appear on the Job Security Rosters attached as Appendices B and C, will be guaranteed regular, full-time positions as Mailers or Helpers for the term of this Agreement." These provisions undoubtedly—at least on their face—create some tension. As the Union points out, that is so because accepting the Post's reading of the scope of § 13(a) and its relation to § 6(f)(1) arguably could make the guarantee provision meaningless. *See Communications Workers v. AT&T Co.*, 40 F.3d 426, 435 (D.C.Cir.1994) (concluding that a dispute was arbitrable by refusing to read one provision as rendering a conflicting provision a nullity). Given the tension, it is certainly plausible to read § 6(f)(1) as a specific restriction overriding the general language of § 13(a)–indeed, it may be the more persuasive reading. *Ceres Marine Terminals*, 683 F.2d at 244.[3]

Even if the language were thought ambiguous, the Post claims that the bargaining history of the agreement is forceful evidence that disputes relating to the number of situations were not subject to arbitration. The Post points out that under the prior collective bargaining agreement the Union attempted to arbitrate the Post's decision to reduce the number of situations in the mark-up. As a result, the Post's objectives in negotiating the present agreement included "to eliminate or narrow the Union's ability to challenge, in arbitration, The Post's exercise of its management rights" in the areas of work assignments, hiring employees, and scheduling employees. Accordingly, the Post

obtained a revision of the grievance and arbitration provisions to narrow the definition of grievance and to exclude from arbitration "matters left unrestricted by a specific provision of this Agreement or left to the discretion of the Publisher." The Post also notes that originally § 13(a) included "discretion" language for the purpose of making decisions concerning the number of situations nonarbitrable, and the Union, through its representative, "stated [its] understanding that this 'discretion' language excluded the matter to which it referred from arbitration." Though this language was replaced with the express statement that the section would not be arbitrable, the Union admitted that it understood the agreed-upon language to have the same meaning as "discretion." We are not persuaded by the Post's resort to bargaining history. Section 6(f)(1) was negotiated and added to the agreement *after* § 13(a), and the parties did not specifically focus on the interrelation between the two provisions.

█ The reasoning of the Seventh Circuit in *Local 75, International Brotherhood of Teamsters v. Schreiber Foods, Inc.*, 213 F.3d 376 (7th Cir.2000), is instructive. There the court determined that the union's grievance over scheduling was arbitrable because, under at least one reasonable reading of the agreement, the employer's discretion over the scheduling was limited, restricted by another provision of the agreement limiting scheduling to "reasonable times and frequencies." *Id.* at 378–80. In this case as well, the agreement easily bears the interpretation the Union asserts. And even the Post conceded at oral argument that if we concluded the arguments made by both sides as to the proper reading of the contract were at least equally plausible then we must direct the district court to order arbitration. It

---

3. The cases the Post cites are inapposite in this case. *See, e.g., Local Union 1393 Int'l Bhd. of Elec. Workers v. Utils. Dist. of W. Ind. Rural Elec. Membership Coop.*, 167 F.3d 1181, 1184 (7th Cir.1999); *Gen. Drivers, Local Union No. 509 v. Ethyl Corp.*, 68 F.3d 80, 84–85

(4th Cir.1995); *Int'l Ass'n of Machinists and Aerospace Workers, Progressive Lodge No. 1000 v. Gen. Elec. Co.*, 865 F.2d 902, 906–07 (7th Cir.1989). The Union has presented us with an arbitrable clause that is expressly and specifically addressed to the grievance.

is not even certain, then, that we must rely on the presumption of arbitrability created by the existence of an arbitration clause to do so in this case.[4] But in any event that presumption does arise, and therefore we think appellant easily prevails.

Having been filed under § 6(f)(1), the grievance is arbitrable and any tension between § 6(f)(1) and § 13(a), as stated, is for the arbitrator to resolve. The decision of the district court is reversed.

*So ordered.*

---

**4.** The Post argues that the presumption cases are inapplicable because they involve the construction of a "broad" arbitration clause. We disagree. While the fact that the arbitration clause in this case is not broad—limiting grievances to allegations of "violation of a specific provision of this Agreement"—is relevant to our inquiry, it does not negate the presumption of arbitrability. *See Int'l Bhd. of Elec. Workers, Local 2188 v. W. Elec. Co.,* 661 F.2d 514, 516 n. 3 (5th Cir.1981).