**ADVANCE PUBLICATIONS, INC., as Successor in Interest to Long Island Daily Press Publishing Co., Inc., Petitioner-Appellee,**

v.

**NEWSPAPER GUILD OF NEW YORK, LOCAL 3, TNG, AFL–CIO, Respondent-Appellant.**

**No. 615, Docket 79–7700.**

United States Court of Appeals, Second Circuit.

Argued Jan. 21, 1980.
Decided Feb. 19, 1980.

Roy N. Watanabe, New York City (Cohn, Glickstein, Lurie, Lubell & Lubell, New York City, Philip D. Tobin, New York City, of counsel), for respondent-appellant.

Bruce H. Berry, New York City (Sabin, Bermant & Blau, New York City, Barry N. Steiner, New York City, of counsel), for petitioner-appellee.

Before SMITH,* FEINBERG, Circuit Judges, and GAGLIARDI, District Judge.**

FEINBERG, Circuit Judge:

In this case we must decide whether a district court improperly set aside an arbitration award that resolved a dispute between a union and an employer. The union is Newspaper Guild of New York, Local 3, TNG, AFL–CIO; the employer is Advance Publications, Inc., successor in interest to Long Island Daily Press Publishing Co., Inc. The union appeals from an order of Judge Henry F. Werker, entered in the United States District Court for the Southern District of New York, that vacated an arbitration award in favor of the union and denied its motion to confirm the award. For reasons set forth below, we reverse the order of the district court and grant the motion to confirm the award.

I

The controversy grows out of the permanent suspension in March 1977 of publication of the Long Island Daily Press and the Long Island Sunday Press. The union, which represented Editorial Department employees, and the employer had been in a collective bargaining relationship for over 30 years; the last contract between the parties commenced in 1974 and by its terms continued in effect until the date when publishing operations ceased. After the newspaper's demise, the employer and the union met many times to discuss various claims of employees under the collective bargaining agreement arising out of the suspension of operations. One such claim was for accrued vacation pay allegedly owed to Louis O'Neill, who had worked at the newspaper for many years and was, at the time of its closing, a Sports Editor. The union claimed on O'Neill's behalf that he was entitled to 20 weeks of accrued vacation pay on his termination date. The employer resisted this claim, and when the parties were unable to agree the union invoked the arbitration clause of the agree-

---

* Pursuant to § 0.14 of the Rules of this Court, this appeal is being determined by Judges Feinberg and Gagliardi who are in agreement on this opinion. Judge Smith, who heard the argument, unfortunately died on February 16, 1980. Prior to his death, Judge Smith voted to reverse and was in agreement with his colleagues on all issues in the case. He did not have the opportunity, however, to see this opinion prior to his death.

** Honorable Lee P. Gagliardi, District Judge of the Southern District of New York, sitting by designation.

ment.[1] The arbitration was held in November 1978, and each party presented evidence, and briefed and argued the issues.

In the arbitration, the union relied on the following provisions in the labor agreement, governing vacation rights:

### ARTICLE IX—VACATIONS

*Section 1*

Each employee shall receive an annual vacation *with full pay* as follows:

(a) After six months employment—1 week's vacation

(b) After one year's employment—2 weeks' vacation

(c) After five years' employment—3 weeks' vacation

(d) After ten years' employment—4 weeks' vacation

(e) After 25 years' employment—5 weeks' vacation

*Section 2—Accrued Vacation*

Upon termination of employment, an employee shall receive *accrued vacation pay.* [Emphasis supplied.]

The union also relied on records of vacation time of the employer's payroll department. These indicated that in the years 1968–1977 O'Neill, who was a high-level employee, took and was paid for some vacation days he earned but in other years did not take and was not paid for vacation days he earned. The sum of O'Neill's earned but unused vacation days in those years was 20 weeks.

The employer's position at the arbitration was that O'Neill was entitled only to three weeks and two days of vacation pay.[2] First, the employer disputed that O'Neill had 20 weeks of unused vacation when the Long Island Press closed. Second, the employer argued that O'Neill's vacation pay for years prior to his final year of employment was barred by a non-contractual but well-established "office rule." That "office rule" provided, as summarized by the arbitrator, that:

all impending annual vacation time-spans had to be spoken for in the current calendar year or otherwise pre-arranged with management, else be pre-set by it in its own discretion, at the risk of loss of the contractual time allotment if not so scheduled or permissibly extended.

According to the employer, since O'Neill had not obtained prior permission to accumulate vacation credits from year to year, they were barred. Finally, the employer argued that the term "accrued vacation pay" in Article IX, Section 2, of the agreement meant only the vacation owed between the time the last vacation was taken and the time of termination.

In a fully reasoned opinion, the arbitrator rejected each of these contentions. First, he carefully examined the records for each year and found that they justified the claim that O'Neill's earned but unpaid vacation totalled 20 weeks. Second, the arbitrator held that even assuming arguendo the existence and validity of the non-contractual "rule" relied on by the employer, O'Neill's claim was not barred.[3] Relying on the tes-

---

1. Article XV, Section 2 of the contract provided:

Any dispute, claim, grievance or difference arising out of or relating to this Agreement or affecting the relations of the employees and the Publisher, which the Guild and the Publisher have not been able after reasonable effort to settle, shall be submitted to arbitration upon notice of either party to the other party to the American Arbitration Association under the voluntary Labor Arbitration Rules then obtaining. The parties agree that such award shall be final and binding. Expenses of arbitration shall be borne equally by the parties.

2. By the time of the November 1978 hearing, O'Neill had died. At the start of the hearing and without prior notice, the employer argued that the right to arbitrate abated with O'Neill's death. The arbitrator rejected this argument, pointing out that the union, not O'Neill, was the signatory to the labor contract and could continue to press the claim on behalf of O'Neill's estate. The employer does not repeat the argument before us.

3. The union argued in the arbitration that the employer could not unilaterally promulgate without the union's consent a rule that cut back the benefits provided for by the contract. The arbitrator found it unnecessary to decide this issue.

timony of the employer's own principal witness, the arbitrator concluded that the purpose of the rule was "to avoid the administrative problem of accommodating long absences from work of employees who might desire, without advance permission and planning, to save up their earned time for an overly prolonged vacation in overlapping seasons in the next ensuing year when they were needed at work." Simply put, the rule merely prohibited employees from carrying over to subsequent years, without prior approval, any earned but unused vacation *time*. Such accumulations of vacation time, taken without prior notice in large amounts in any year, could arguably adversely affect the operation of the newspaper.[4] However, the rule did not bring about a forfeiture of the vacation *pay* earned, but not received, in any year. Finally, in view of the explicit terms of Article IX, the arbitrator held that O'Neill was entitled on his termination to his full 20 weeks of accrued vacation pay, not just the pay accrued from the previous summer. The sum of these amounts, at the rates in effect in the years in question, was $6,196.36, the amount of the arbitrator's award.

The arbitrator issued his opinion and award in March 1979. In June 1979, the employer brought this action under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) and Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10, to vacate the award; the union cross-moved to confirm the award. In August 1979, the district judge vacated the award and denied the motion to confirm, on the ground that the arbitrator had exceeded his authority in distinguishing between vacation pay and vacation time and in giving the vacation provision "retroactive application" to years prior to 1974, when the last collective bargaining agreement had been negotiated. This appeal followed.

## II

Appellant union argues that the district court erred in vacating the award of the arbitrator on the ground that he exceeded his authority. Citing such cases as *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) and *Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691 (2d Cir. 1978), the union contends that the arbitrator's award drew "its essence from" the labor agreement and that the district judge improperly substituted his interpretation of the agreement, and his judgment concerning the appropriate remedy, for the arbitrator's. Citing the same two cases and others, the employer responds that the district judge properly vacated the award because it was neither rational nor based upon the current bargaining agreement.

The governing principles in cases like this are not new. However, the citation by the parties of some of the same cases suggests that agreement on principles does not necessarily resolve disputes. This is understandable, since the contending self-interest of each party colors its reading of the cases. However, both *Enterprise Wheel* and *Andros* support appellant. In the former, the Supreme Court noted that " . . . so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." 363 U.S. at 599, 80 S.Ct. at 1362. And in *Andros*, we noted that

. . . this much at least is certain: When arbitrators explain their conclusions . . . in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result.

579 F.2d at 704.

We are aware, as we recently noted in *In re Conticommodity Services, Inc.*, 613 F.2d

---

**4.** The arbitrator also noted, but found it unnecessary to decide, the union's argument that the employer had "tacitly signified" that O'Neill could accumulate vacation *time*. The arbitrator found that "O'Neill, as a rather old-time institutionalized Sports Editor, was treated somewhat uniquely and allowed to go his own way about timing his vacations, without regard to normal scheduling required of others in the department."

**618**

1222, 1224 (2d Cir. 1980), that judges find it difficult to refrain from correcting what they regard as substantive errors in the arbitration case before them because, "by temperament and training," they are quite prepared to correct them. But it must be remembered that the parties to a contract containing a broad arbitration clause, see note 1 supra, have agreed to accept the judgment of an· arbitrator, not that of a judge. By doing so, each party also accepts the risk that the arbitrator's interpretation of the contract will disagree with its own and may, in fact, be wrong. See *I/S Stavborg v. National Metal Converters, Inc.*, 500 F.2d 424, 432 (2d Cir. 1974). This risk is assumed, however, to obtain such presumed benefits of arbitration as speed, economy and the availability of the judgment of an expert in the field to resolve disputes that, particularly in the labor context, might lead to plant unrest. *United Steelworkers of America v. Warrior & Gulf Co.*, 363 U.S. 574, 578, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). See also *In re Conticommodity Services, Inc.*, supra, 613 F.2d at 1224. It is for this reason that "[W]e have consistently accorded the narrowest of readings to the [Federal] Arbitration Act's authorization to vacate awards '[w]here the arbitrators exceeded their powers.'" *Andros*, supra, 579 F.2d at 703, quoting 9 U.S.C. § 10(d).

With these principles and precedents in mind, we conclude that the arbitrator here did not exceed his powers. Under the contract, an employee was entitled to receive both "an annual vacation with *full* pay" and "*accrued* vacation pay" when his employment terminated. (Emphasis supplied). One arguable interpretation of this language is that an employee is entitled to accrue vacation *pay* and vacation *time* from year to year. However, the employer introduced evidence of an "office rule" that affected the carrying over, or accrual, of vacation time. While this "rule" was not embodied in the written contract, the arbitrator accepted arguendo that such a rule applied to O'Neill. The arbitrator nonethe-

less concluded that because the purpose of the rule was to permit the employer to plan for anticipated employee vacations, the rule did not affect accrual of vacation pay. In analyzing the distinction between vacation pay and vacation time, the arbitrator no more "rewrote" the contract than the employer did in suggesting that a noncontractual rule regarding notification as a prerequisite to accruing vacation time barred O'Neill's claim. Moreover, the arbitrator persuasively explained why he rejected the employer's fall-back position that the right to receive "accrued vacation pay" meant only the right to receive pay for vacation owed between the time the last vacation was taken and the date of termination. Indeed, the arbitrator pointed out that on this theory it was difficult to understand the employer's concession that O'Neill was entitled to 17 days vacation pay.

On the evidence before him, the arbitrator's explanation for his decision was far more than "a barely colorable justification for the outcome reached." Moreover, the arbitrator was not required to base an award for years prior to 1974 on a contract clause providing for retroactivity, as the employer now contends.[5] The arbitrator could reasonably interpret the vacation provisions in the most recent contract as allowing such accrual. As the Supreme Court noted in *Enterprise Wheel*:

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of the problem. This is especially true when it comes to formulating remedies.

363 U.S. at 597, 80 S.Ct. at 1361.

The judgment of the district court is reversed, and the cross-petition of the union to confirm the arbitration award is granted.

---

**5.** The employer apparently did not press this argument before the arbitrator.