Peter OTTLEY, as President of Local 144, Hotel, Hospital, Nursing Home & Allied Services Union, SEIU, AFL–CIO, Petitioner-Appellee,

v.

SHEEPSHEAD NURSING HOME, Respondent-Appellant.

No. 766, Docket 81–7802.

United States Court of Appeals, Second Circuit.

Argued May 13, 1982.
Decided Aug. 26, 1982.

Robert B. Stulberg, New York City (Vladeck, Waldman, Elias & Engelhard, P.C., Robert A. Cantore, New York City, of counsel), for petitioner-appellee.

Morris Tuchman, New York City (Gluck & Tuchman, Rebecca A. Weiss, New York City, on the brief, of counsel), for respondent-appellant.

Before FEINBERG, Chief Judge, and LUMBARD and NEWMAN, Circuit Judges.

FEINBERG, Chief Judge:

Sheepshead Nursing Home (SNH) appeals from a judgment of the United States District Court for the Southern District of New York, John M. Cannella, J., confirming an arbitration award upon the motion of Peter Ottley, as President of Local 144, Hotel, Hospital, Nursing Home & Allied Services Union, SEIU, AFL–CIO (Local 144, the Union) pursuant to the Federal Arbitration Act, 9 U.S.C. § 9. The judgment, entered in October 1981, followed a June 1981 order of the same court denying appellant's motion to stay arbitration. The arbitration award, which was rendered in July 1981, ordered SNH to reinstate Trevor Bennett as a cook and to pay him $3,500 for the monetary loss sustained by his improper dismissal. On appeal, SNH claims that the arbitrator was without power to entertain this grievance; that the arbitrator improperly looked beyond the bargaining agreement to determine SNH's duties; and that the award on its merits conflicts with federal labor law. The Union in turn claims that this appeal is wholly without merit and

frivolous, and demands that double costs and attorneys' fees be awarded pursuant to 28 U.S.C. § 1912 and Fed.R.App.P. 38 and 39(a). Contrary to the Union's assertions, we find the issues presented by this appeal substantial. While we affirm the judgment below, we deny appellee's request for double costs and fees.

### I.

Effective April 1, 1978, the Greater New York Health Care Facilities Association, Inc. (the Association), a multi-employer nursing home association to which appellant belonged, entered into a collective bargaining agreement with Local 144 covering various aspects of the employment of its members. The agreement had a three-year term until March 31, 1981. On October 30, 1980, SNH withdrew its membership from the nursing home association. On January 7, 1981, it discharged Trevor Bennett, an employee for nine years and a shop steward. Five weeks later, on February 12, 1981, Local 144 demanded arbitration concerning this discharge. SNH refused to arbitrate, claiming that under the terms of the collective bargaining agreement its withdrawal from the Association released it from all obligations under the contract, including the obligation to arbitrate.

In early March 1981, SNH moved for a stay of arbitration. Its motion came before Judge Cannella, who denied it in a memorandum opinion. He appeared to assume that the agreement had terminated prior to Bennett's discharge, but held that under *Nolde Brothers, Inc. v. Local 358, Bakery & Confectionery Workers*, 430 U.S. 243, 255 n. 8, 97 S.Ct. 1067, 1074 n. 8, 51 L.Ed.2d 300 (1977) because of the broad arbitration clause in the labor contract, the duty to arbitrate employee grievances survived the termination of the contract, at least for a reasonable time. Three and one-half months (from October 30 to February 12) was held to be a reasonable time.

SNH filed a timely notice of appeal, but withdrew it before the appeal was decided.[1]

The dispute then proceeded to arbitration before Sidney A. Wolff, the arbitrator named in the contract. He found that contrary to the apparent assumption of the district court, the contract had not terminated. He appeared to reason that since the employer failed to give the 60-days notice of termination to the Union that is required by § 8(d)(1) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(d)(1), or the 30-days notice to the Federal Mediation and Conciliation Services per § 8(d)(3), 29 U.S.C. § 158(d)(3), the contract continued "in full force and effect" under § 8(d)(4), 29 U.S.C. § 158(d)(4). Wolff also noted, and appeared to agree with, Judge Cannella's broad construction of *Nolde*. On the merits of the grievance, Wolff found in favor of the Union, and directed that the discharged employee be reinstated and paid $3,500 "in full payment and settlement of his claim for monetary loss caused by his improper dismissal." The Union returned to the district court to have the arbitration award confirmed, and by order dated October 7, 1981, Judge Cannella did so.

### II.

SNH claims that the award must be set aside under 9 U.S.C. § 10(d) because the arbitrator exceeded his powers in arbitrating this dispute. This is so, the employer argues, because the duty to arbitrate is purely a creature of contract, citing *Procter & Gamble Independent Union v. Procter & Gamble Manufacturing Co.*, 312 F.2d 181, 184 (2d Cir. 1962), cert. denied, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963). The contract in issue here provided in section 32 that "[i]f the membership in the Association of any nursing home ... is terminated ..., this agreement shall become null and void

---

[1]. The Union claims that the issue of arbitrability is no longer before this court because SNH's failure to pursue an appeal of the stay action makes arbitrability the law of the case. While it is clear that an order granting a motion to compel arbitration is appealable, *Goodall-Sanford, Inc. v. United Textile Workers*, 353 U.S. 550, 77 S.Ct. 920, 1 L.Ed.2d 1031 (1957), under our case law an order denying a motion to stay arbitration is not appealable, *Greater Continental Corp. v. Schechter*, 422 F.2d 1100 (2d Cir. 1970). We believe in any event, as will be seen below, that Judge Cannella properly allowed the arbitration to proceed.

to such Employer."[2] SNH claims that Judge Cannella had found in his decision to deny the stay that the contract terminated when SNH withdrew from the Association, and that this determination is dispositive of the Union's rights. Citing *International Union of Operating Engineers v. Flair Builders, Inc.,* 406 U.S. 487, 491, 92 S.Ct. 1710, 1712–1713, 32 L.Ed.2d 248 (1972), SNH argues that without a contract, it is under no obligation to settle grievances through the arbitral process.

■■ We disagree with SNH's mode of analysis. By focusing initially only on section 32 of the contract, SNH places the cart before the horse. As we have made clear in recent decisions, see *McAllister Brothers, Inc. v. A & S Transportation Co.,* 621 F.2d 519, 521–23 (2d Cir. 1980); *Rochdale Village, Inc. v. Public Service Employees Union, Local No. 80,* 605 F.2d 1290, 1294–97 (2d Cir. 1979), the arbitrability of any dispute turns in the first instance on the arbitration clause of the contract. This is so because our duty is to implement the intent of the parties. To determine their intent, we must first examine the terms of their contract. If its arbitration clause is broad, then we must find that the parties bargained to have any dispute that arguably falls within the scope of that clause settled through arbitration, absent compelling proof to the contrary. See *United Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 571, 80 S.Ct. 1343, 1364, 4 L.Ed.2d 1403 (1960) (Brennan, J., concurring) ("the parties may have provided that any dispute as to whether a particular claim is within the arbitration clause is itself for the arbitrator . . . . [T]he court, without more, must send [the] dispute to the arbitrator, for the parties have agreed that the construction of the arbitration promise itself is for the arbitrator . . . ."); *Nolde,* 430 U.S. at 252–55, 97 S.Ct. at 1072–1074 (broad arbitration clause creates a presumption of arbitrability). In *Nolde,* it was conceded that the contract had terminated when the

dispute arose, yet the Court required arbitration. A fortiori, these principles apply if one of the key contract issues in dispute before the court is whether, as was the case in *McAllister* and in *Rochdale,* and as SNH contends here, the contract has terminated. See also *United Steelworkers v. American Smelting and Refining Co.,* 648 F.2d 863, 866–67 (3d Cir.), cert. denied, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); Goetz, Arbitration After Termination of a Collective Bargaining Agreement, 63 Va.L.Rev. 693 (1977); Note, The Scope of Arbitration Agreements—The Arbitrability of Collective Bargaining Agreement Terminations and Expirations: *Rochdale Village, Inc. v. Public Service Employees Local 80,* 9 N.Y. U.Rev.L. & Soc. Change 337 (1971–1980). This does not mean that, in the face of a claim that a contract with a broad arbitration clause has terminated, a court must always order arbitration simply because the other party to the contract requests it. In such a situation, there must at least be a colorable claim under the contract that the contract has not terminated. As will be seen below, such a claim exists here.

■ The arbitration clause in this case, section 8 of the contract, provides in part that:

### 8. GRIEVANCE PROCEDURE

A. *All* complaints, *disputes,* controversies or grievances arising between the parties hereto involving questions of *interpretation or application of any clause of this agreement, or any acts, conduct or relations* between any of the parties hereto and/or between the Union and any Employer, *directly* or *indirectly,* which shall not have been adjusted by and between those involved shall be submitted to the Impartial Chairman hereinafter mentioned for arbitration and his decision shall be final and binding upon the parties hereto. (Emphasis supplied).

---

**2.** This section reads in full as follows:

32. INDEPENDENT CONTRACTS

If the membership in the Association of any nursing home consenting hereto is terminated for any reason whatsoever, this agreement shall become null and void to such Employer.

The first dispute between the Union and SNH is whether the contractual duty to arbitrate employee grievances terminated when SNH withdrew from the multi-employer association. That decision obviously involves the meaning of "null and void to such Employer" as used in section 32 of the contract, see note 2 supra. A question immediately arises whether, as SNH contends, its withdrawal from an association of employers could immediately terminate SNH's obligations to the Union under the contract without notice to it. The question becomes more pointed because of the Union's argument to us that under section 33 of the contract,[3] SNH could not terminate the contract before the "expiration date" of March 31, 1981, and 24 hours thereafter. The arbitration clause quoted above is a broad one, as the italicized language indicates. It encompassed "all" questions of "interpretation or application of any clause" of the agreement "or any acts, conduct or relations" between the parties, "directly or indirectly." In light of this language, as we said in *Rochdale*, "all questions, *including those regarding termination,* will be properly consigned to the arbitrator...." 605 F.2d at 1295 (emphasis supplied). We find, therefore, that Judge Cannella properly allowed the arbitrator to decide the issue of whether SNH's obligations under the contract had terminated.[4]

**3.** Section 33 provides that:
> 33. DURATION
> A. This agreement shall continue in full force and effect from April 1, 1978 through March 31, 1981.
> B. This agreement shall continue in effect during negotiations even though such negotiations extend beyond the expiration date for such reasonable length of time thereafter as may be required for the negotiation of a new agreement. Following the expiration date, either party may terminate the agreement upon twenty-four (24) hours' notice. Any wage increases included in such agreement shall be retroactive to the date of expiration.

**4.** *Diamond Glass Corp. v. Glass Warehouse Workers and Paint Handlers Local Union 206,* 682 F.2d 301 (2d Cir. 1982), is not to the contrary. In that case, both parties acknowledged that the contract had expired by its terms prior to the Union's demand for arbitration. Moreover, the Union apparently refused or was unable to demonstrate to the trial court's satisfac-

III.

SNH responds that even if the arbitrator had the power to decide whether the agreement had terminated, he exceeded his authority when he based his decision on federal law rather than on the contract. This argument is based on the well-known language of *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), where Justice Douglas stated that:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

The arbitrator noted that SNH "withdrew its membership in the Association" on October 30 but held that this "in and of itself did not terminate the collective bargaining agreement so far as [SNH] is concerned" because of SNH's "failure ... to establish that it complied with" 29 U.S.C. § 158(d), reproduced in the margin.[5] The arbitrator

tion that the dispute either arose during the time that the contract was in effect or under its terms. Under the circumstances, there was no room to argue in that case that termination was an issue to be decided by the arbitrator, or that the obligation to arbitrate the dispute survived the termination of the agreement under *Nolde.*

**5.** Section 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d) reads as follows:
> (d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either

concluded that as a result SNH's "attempt ... to terminate the labor agreement ... must be deemed futile."

■ The leeway given arbitrators to look at factors outside the contract has been much debated in recent years, see, e.g., Meltzer, Ruminations About Ideology, Law and Labor Arbitration, 34 U.Chi.L.Rev. 545, 558 (1967) ("Arbitrators should in general accord ... respect to the agreement that is the source of their authority and should leave to the courts or other official tribu-nals the determination of whether the agreement contravenes a higher law."); Kaden, Judges and Arbitrators: Observations on the Scope of Judicial Review, 80 Colum.L.Rev. 267, 288 (1980) ("Increasingly [the arbitrator] will find himself engaged in the difficult process of finding and applying external law ...."). Cf. *Barrentine v. Arkansas-Best Freight System,* 450 U.S. 728, 743, 101 S.Ct. 1437, 1446, 67 L.Ed.2d 641 (1981). We reject a per se rule that denies enforcement of an award simply because it

party to agree to a proposal or require the making of a concession: *Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:
The duties imposed upon employers, employees, and labor organizations by paragraphs (2)–(4) of this subsection shall become inapplicable upon an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 159(a) of this title, and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. Any employee who engages in a strike within any notice period specified in this subsection, or who engages in any strike within the appropriate period specified in subsection (g) of this section, shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 158 to 160 of this title, but such loss of status for such employee shall terminate if and when he is reemployed by such employer. Whenever the collective bargaining involves employees of a health care institution, the provisions of this subsection shall be modified as follows:

(A) The notice of paragraph (1) of this subsection shall be ninety days; the notice of paragraph (3) of this subsection shall be sixty days; and the contract period of paragraph (4) of this subsection shall be ninety days.

(B) Where the bargaining is for an initial agreement following certification or recognition, at least thirty days' notice of the existence of a dispute shall be given by the labor organization to the agencies set forth in paragraph (3) of this subsection.

(C) After notice is given to the Federal Mediation and Conciliation Service under either clause (A) or (B) of this sentence, the Service shall promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement. The parties shall participate fully and promptly in such meetings as may be undertaken by the Service for the purpose of aiding in a settlement of the dispute.
Section 152(14) provides that:

(14) The term "health care institution" shall include any hospital, convalescent hospital, health maintenance organization, health clinic, nursing home, extended care facility, or other institution devoted to the care of sick, infirm, or aged person.
In his award, Arbitrator Wolff did not take into account the variation in this statute that is applicable to nursing homes. This error, however, had no effect on his decision, and for purposes of this discussion, we have ignored the more onerous notice requirements imposed in the health care field.

rests upon an arbitrator's interpretation of external law. Arbitration is favored because it is fast and cheap. Rapid, binding decisions promote industrial peace and create a system of industrial self-government that is capable of fashioning remedies that are perhaps more flexible than those available in a court of law, *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578–81, 80 S.Ct. 1347, 1350–1352, 4 L.Ed.2d 1409 (1960). If, however, we confine the arbitrator to mechanically interpreting contracts in a vacuum, we critically hinder his ability to achieve these goals. The contract, after all, was drafted against a backdrop of stringent government regulation.[6] It makes little sense to require the arbitrator to ignore this background and to render a decision that may be in conflict with the mandate of law and that therefore might later be set aside. This resolution would thwart federal policy rather than further it.

■ If we refuse to set aside the arbitration award on the ground that the arbitrator looked to external law, we must next deal with SNH's argument that the award is invalid because of a conflict between our own decision in *Procter & Gamble*, supra, where we held that a union's failure to give the 30-days notice required by § 8(d)(3) of the Act did not "have the effect of extending the period of the expired contract," 312 F.2d at 189, and the arbitrator's finding

that SNH could not effectively terminate the contract without giving the Union the notice required by §§ 8(d)(1) and (3). While this apparent conflict is troublesome, I would leave for another day the question of the scope of review to be accorded arbitration awards that are based solely on an erroneous interpretation of public law,[7] for I do not believe that Arbitrator Wolff's award under this agreement can fairly be so characterized.

In ruling that the contract had not yet terminated at the crucial time,[8] the arbitrator relied not only on § 8(d)(3) but also on § 8(d)(1), which deals with the failure of one party to a labor agreement to give 60-days notice of termination to the other. The Union argues to us that no notice of termination was given prior to the time that arbitration was sought, and SNH does not deny this contention.[9] It is apparently SNH's theory that under this contract, it could terminate its duties to the Union and its members without ever notifying the Union that all rights and obligations had been extinguished. Although Judge Newman does not join me in this view, I think that it is at least fairly arguable that the arbitrator rejected this interpretation, which would allow one side to terminate an agreement unilaterally and without unequivocal notice of termination to the other side. While he did not specifically refer to section 33 of the contract, which clearly requires

---

6. Kaden, supra at 285, cites as examples the Occupational Safety and Health Act, 29 U.S.C. §§ 651–658; the Employment Retirement and Income Security Act, id. §§ 1001–1381; the Age Discrimination in Employment Act, id. §§ 621–634; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17; the Equal Pay Act of 1963, 29 U.S.C. § 206.

7. We have often reiterated the proposition that "an award will not be set aside for a mistaken application of the law...." *Local 771, I. A. T. S. E. v. RKO General, Inc.*, 546 F.2d 1107, 1113 (2d Cir. 1977); *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1214 (2d Cir. 1972). See also *Wilko v. Swan*, 346 U.S. 427, 436, 74 S.Ct. 182, 187, 98 L.Ed. 168 (1953). But it has been suggested that allowing arbitrators full reign to interpret public law according to their own understanding may not be consistent with the responsibilities of a judge, see *Kaden*, supra at

288–89, *Barrentine*, 450 U.S. at 737, 101 S.Ct. at 1443.

8. Bennett was discharged on January 7, 1981, and arbitration was demanded on February 12, 1981. The "expiration date" set forth in Section 33 of the contract was March 31, 1981.

9. In post-argument letter briefs to us, the Union flatly states that it is undisputed that SNH "failed to demonstrate compliance with *any portion*" of § 8(d), and SNH's answering letter brief does not deny this. Moreover, after the arbitrator issued his award, SNH wrote him two letters rearguing two points. In neither letter did SNH claim that it had given unequivocal notice of termination to the Union, even though the second letter set forth its legal contention that a failure to give § 8(d) notice would not affect termination of the contract in this case.

24-hours notice following the "expiration date" of March 31 for termination,[10] the arbitrator, as already indicated, did focus on the notice problem when he ruled that the contract had not terminated. The arbitrator could certainly have concluded that by analogy the "null and void" provision of section 32 required at least a one-day unequivocal notice of termination to the union to be effective. Furthermore, in discussing the merits of the grievance, the arbitrator pointed out that throughout Bennett's employment, SNH continued to recognize its obligations under the contract by checking off Bennett's union dues and by contributing to the union pension funds. I cannot say, therefore, that the arbitrator's conclusion that SNH did not terminate this agreement simply by withdrawing from the multi-employer association did not "draw . . . its essence" from the agreement.

Nor is *Procter & Gamble* necessarily to the contrary. A plausible argument can be made that the case stands only for the proposition that a contract is not extended by a party's failure to notify the mediation authorities of its termination. Because the panel stated that it considered "[t]he requirement of notifying the federal and state mediation services . . . a subordinate feature of the plan," and that "[t]here is no suggestion in the text [of § 8(d)] that a failure to meet the notice requirements of paragraph (3) will have any effect on paragraph (4)," 312 F.2d at 188, I cannot say how the *Procter & Gamble* court would have ruled in the case at bar.

Because I find that the arbitration award could reasonably have been derived from the terms of the contract itself, I decline to set the award aside on the ground that the arbitrator's reasoning disagrees with *Proc-*

ter *& Gamble.* Cf. *Andros Compania Maritima, S.A. v. Marc Rich & Co.,* 579 F.2d 691, 704 (2d Cir. 1981). This interpretation has the incidental benefit of laying to rest appellant's "worst case" analysis, which it presented at oral argument. SNH claims that under the views expressed by Judge Cannella and the arbitrator, the duty to arbitrate continues forever. This holding, the employer argues, would ultimately frustrate federal policy because a complete inability to nullify the duty to arbitrate would discourage parties from committing themselves to arbitration provisions. But this scenario could not obtain in this case: The contract provides for continuation after expiration only "for such reasonable length of time thereafter as may be required for the negotiation of a new agreement", and even then, either party could terminate on 24-hours notice; a claim years after the termination date that notice was still required by the contract would not be a colorable claim warranting arbitration.

## IV.

The other challenges to the arbitration award presented by SNH are without merit. Appellant claims that under section 8H of the contract, grievances related to discharges that are not presented within 15 days of the discharge are waived.[11] It is well settled in this jurisdiction that procedural issues are for the arbitrator in the first instance, *Conticommodity Services, Inc. v. Philipp & Lion,* 613 F.2d 1222, 1226 (2d Cir. 1980), and that the arbitrator's decision is then subject only to limited review, cf. *Sobel v. Hertz, Warner & Co.,* 469 F.2d at 1214. While it is true that the arbitrator in his opinion did not explicitly focus on section 8H of the contract, the Union points

---

10. On these facts, it is not necessary to decide whether the contract between the employer and the Union could have been terminated before March 31, 1981.

11. Section 8H provides in relevant part that:
    Each grievance, in any event, shall be presented to the other party hereto in writing, on forms adopted by the Union and the Association. Grievances arising from discharges, other disciplinary action or layoffs

shall be presented within fifteen (15) work days from the time of the occurrence, or from the time such occurrence should reasonably have become known, whichever is later . . . . In the event a grievance relating to discharge, discipline or layoff is not presented within the time limitation set forth above, such grievance shall be deemed to have been waived by the aggrieved party and, for all purposes, barred . . . .

out that SNH did not assert this objection until after the award was rendered. The arbitrator could well have found that a defense based on section 8H, which is so closely analogous to a statute of limitations defense, was waivable, and implicitly held by his refusal to reconsider the arbitration, that SNH had waived the objection in this case. We thus cannot say that there was no "colorable justification for the outcome reached." Cf. *Advance Publications, Inc. v. Newspaper Guild Local 3,* 616 F.2d 614, 618 (2d Cir. 1980). Accordingly, we refuse to set aside the arbitration award on the ground that the grievance was not timely presented.

█ Finally, appellant claims that the award cannot be enforced because it conflicts with federal labor law. SNH points out that in February 1981, the National Labor Relations Board issued a complaint based on Trevor Bennett's discharge. In that complaint, the Board described Bennett as a supervisor of SNH within the meaning of § 2(11) of the Act, 29 U.S.C. § 152(11). We do not see why this characterization in the complaint of the Regional Director necessitates setting aside the arbitrator's award. Section 14(a) of the Act, 29 U.S.C. § 164(a), states that "[n]othing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization. . . ." More important, only the requirements of the contract are in issue here. Section 1 of the contract provides that "[i]n the event any dispute arises as to whether or not an employee does in fact come within one of the excluded categories above mentioned [including supervisory employee], such dispute shall be submitted to arbitration for settlement and determination in the manner hereinafter provided." The arbitrator specifically found that Bennett was not a

supervisor within the meaning of the labor contract, and that the employer had recognized him as a member of the bargaining unit by checking off his dues and making contributions on his behalf to the union pension and welfare funds. Nor do we see any reason why the definition of "supervisor" in the contract must agree with its definition in federal law. This award does not conflict with national law or national policy and should not be set aside on that ground.

For the foregoing reasons, the judgment of the district court is affirmed. Double costs and attorneys' fees are denied; appellee is entitled to the usual costs.

NEWMAN, Circuit Judge, concurring:

I fully agree with Chief Judge Feinberg that, under the broad arbitration clause of the contract between Sheepshead Nursing Home (SNH) and Local 144 (the Union), the arbitrator had authority to decide the contract issue whether the October 30, 1980, withdrawal of SNH from the multi-employer Association, allegedly without timely notice to the Union,[1] was effective to render the contract null and void as to SNH. Though § 32 of the contract provides that the contract becomes null and void as to a nursing home that terminates its membership in the Association, there remains an issue of contract interpretation as to whether the parties intended the contract-terminating consequence of withdrawal to occur in the absence of proper notice to the Union.

However, I disagree with Chief Judge Feinberg's further conclusion that the arbitrator, having authority to interpret the contract on the issue of termination, did so. He maintains that the arbitration award "could reasonably have been derived from the terms of the contract," suggesting that the arbitrator "could" have concluded by

[1] I agree with Chief Judge Feinberg that we are entitled to accept the Union's contention that no timely, unequivocal notice was given to it, in light of SNH's silence in the face of repeated denials of notice by the Union, both at oral argument and in post-argument papers specifically directed to issues concerning the notice provisions of § 8(d) of the National Labor Rela-

tions Act. *See* footnote 7, *infra,* and accompanying text. I therefore need not reach the issue of whether it would be for the arbitrator or the District Judge to resolve a disputed issue of fact concerning the receipt of timely notice, in the event application of the statute turned on such a dispute.

analogy that § 32 requires at least the one-day notice required by § 33B. Had the arbitrator given no indication of his reasoning, I would certainly accord him the presumption that his award drew its essence from the contract and accept as plausible the interpretation of the contract that Chief Judge Feinberg suggests "could" have been made. *See Kurt Orban Co. v. Angeles Metal Systems,* 573 F.2d 739, 740 (2d Cir. 1978); *Sobel v. Hertz, Warner & Co.,* 469 F.2d 1211, 1214–16 (2d Cir. 1972). But the arbitrator set forth his reasoning and made it unmistakably clear that in deciding whether the contract continued beyond the date of SNH's withdrawal and extended for a period in which the challenged discharge of an employee occurred, the arbitrator was not relying on the terms of the contract but instead was relying on a provision of federal statutory law, § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d) (1976). The arbitrator wrote:

> That this Employer withdrew from the Association in and of itself did not terminate the collective bargaining agreement, so far as it is concerned, appears to be the conclusion to be drawn from the failure of the Employer to establish that it complied with the *Labor-Management Relations Act,* 29 USCA § 158(d).

He then sets forth the full text of § 8(d) and adds:

> Consequently the attempt of this employer to terminate the labor agreement to which it was a party must be deemed futile.

In light of this explicit statement of reasoning,[2] I think we must decide whether the arbitrator's view of § 8(d) is correct. Before reaching the merits of that issue, two preliminary points are in order. First, when an arbitrator's authority to determine a grievance turns directly on an interpretation of a federal statute, the statutory issue should be decided by the District Court that is asked to stay the arbitration. In this respect this case is complicated because at the time of SNH's motion to stay, the Union had two grounds available to it in resisting that motion. It could have argued that the contract itself required notice to the Union to render effective an employer's attempt to terminate the contract as to it by withdrawing from the Association. That contention could properly have been referred to the arbitrator. But the Union also had available the statutory argument based on § 8(d). That argument, standing independently of the contract, required determination by the District Court. Second, once the entire matter was sent to arbitration and the arbitrator elected to decide solely on statutory grounds that the contract had not expired as to SNH, I see no reason to vacate the award if the arbitrator's view of federal law is correct. If § 8(d) does extend the contract as to SNH in the circumstances of this case, then, as will be seen, the arbitrator had authority to adjudicate the grievance concerning the wrongful discharge. I therefore find it necessary to reach the issue whether § 8(d) extends the contract as to SNH.[3]

**2.** If the arbitrator had based his decision on the issue of contract termination on the contract itself, looking to the federal statute only for guidance or analogy as an aid to interpretation of the contract, I would agree that we could simply accept his interpretation of the contract, even if we thought his view of federal law was "mistaken," *Local 771, I. A. T. S. E. v. RKO General, Inc., WOR Division,* 546 F.2d 1107, 1113 (2d Cir. 1977); *Sobel v. Hertz, Warner & Co.,* 469 F.2d 1211, 1214 (2d Cir. 1972), or in "error," *Office of Supply, Government of the Republic of Korea v. New York Navigation Co.,* 469 F.2d 377, 379 (2d Cir. 1972). But, though the Union contends that the arbitrator did rely on the contract in resolving the termination issue, the arbitrator's own words reveal that he relied exclusively on the federal statute, not as an aid in contract interpretation, but as a command of positive law.

**3.** An alternative course would be to remand with directions *to return the matter to the arbitrator* for consideration of whether, as a matter of contract interpretation, SNH's withdrawal from the Association was ineffective, for lack of notice to the Union, to render the contract null and void as to SNH. Since Chief Judge Feinberg is satisfied that such a determination has already been made and since I am satisfied that the same result was correctly reached by application of § 8(d), a majority of the panel concludes that the award should be confirmed, and a remand is therefore unnecessary.

Section 8(d) defines the obligation to bargain collectively, breach of which is an unfair labor practice, §§ 8(a)(5), 8(b)(3). When a collective-bargaining contract is in effect, § 8(d) specifies that the duty to bargain means that a party to the contract shall not terminate or modify the contract without complying with the four subsections of § 8(d). Subsection 8(d)(1) requires notice to the other party of proposed termination or modification sixty days prior to the proposed termination or modification. Subsection 8(d)(3) requires notice to federal and state mediation officials thirty days after the (d)(1) notice. Subsection 8(d)(4), pertinent to this case, requires that the terminating party "continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given [the (d)(1) notice] or until the expiration date of such contract, whichever occurs later."

As we observed in *Procter & Gamble Independent Union of Port Ivory, N.Y. v. Procter & Gamble Manufacturing Co.,* 312 F.2d 181, 188 (2d Cir. 1962), *cert. denied,* 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963), the purpose of § 8(d) is to provide a waiting period during which there can be no strike or lockout. SNH contends that the statute is concerned only with the temporary prohibition of a strike or lockout and has no application to this case since no strike or lockout occurred. Both the terms of the statute and common sense refute that contention. During the time period to which it applies, § 8(d)(4) obliges the party seeking termination to continue "in full force and effect ... all the terms and conditions of the existing contract." Moreover, in prohibiting a strike or lockout during that time period, the statute cannot sensibly be read to be inapplicable whenever the parties heed its command and refrain from

a strike or lockout. While the employees remain at work, their rights and obligations and those of their employer must be governed by some standards; Congress obviously would not have required employees to remain at work without enforceable rights to receive wages and other benefits. The pertinent authority, as § 8(d)(4) explicitly provides, is the existing contract.

In *Procter & Gamble* we were asked to rule that a contract remained in effect beyond its expiration date simply because the employer had failed to provide conciliation officials the thirty-day notice required by § 8(d)(3). The employer had given the union the notice required by § 8(d)(1), and the dispute arose long after the sixty-day extension period following the (d)(1) notice, which is provided by § 8(d)(4). Nevertheless the union sought to invoke (d)(4) as a remedy for lack of the notice required by (d)(3). Judge Hays rejected that argument, noting that "the requirement of paragraph (3) that federal and state agencies be notified is entirely independent of paragraph (4)." 312 F.2d at 188. The message of *Procter & Gamble* is that (d)(4) stands on its own. That decision, however, does not govern this case, where timely (d)(1) notice was not given, thus triggering (d)(4)'s explicit provision for contract extension in the absence of such notice.

It is arguable that the contract-extending command of § 8(d)(4) creates only the basis for an unfair labor practice within the jurisdiction of the National Labor Relations Board in the event that the party attempting termination fails to continue the contract, and does not of its own force continue the contract and render it enforceable in suits in the district courts under § 301 of the Act, 29 U.S.C. § 185. Dictum in *Procter & Gamble* can be read as subscribing to that view.[4] This contention arises at the

---

**4.** After holding that lack of (d)(3) notice did not continue the contract, since the contract-continuing language of (d)(4) is triggered only by lack of a (d)(1) notice, the opinion in *Procter & Gamble* also observes that "the provision does not suggest that failure to comply will constitute a breach of contract, or that the courts are authorized to take over the function of the Board by awarding specific performance of 'the terms and conditions of the existing contract.' Failure to comply is an unfair labor practice which the Board may redress by a proper order." 312 F.2d at 188–89. If this language is still referring to (d)(3), it simply reenforces the holding by observing that courts are not authorized to remedy a violation of (d)(3) by apply-

interface between the traditional doctrines that unfair labor practices are not contract violations, cognizable as such by district courts under § 301, *C–B Buick, Inc. v. NLRB,* 506 F.2d 1086, 1094 (3d Cir. 1974), and contract actions are not shielded from district court scrutiny under § 301 simply because they are also unfair labor practices, cognizable as such by the Board, *Smith v. Evening News Ass'n,* 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). If in this case the Union had sued SNH, claiming that the employer had breached the contract by failing to give a (d)(1) notice or by failing to continue the contract as required by (d)(4), it would seem clear that such allegations of conduct arguably constituting unfair labor practices in violation of the employer's duty to bargain could not be transformed as such into contract violations cognizable in a district court. But by bringing this suit to enforce a contractual duty to arbitrate, the Union has not seized upon an unfair labor practice of the employer and characterized it as a breach of contract. Instead, the Union has relied upon § 8(d)(4) as a Congressional command that, in the absence of timely (d)(1) notice, the contract continues "in full force and effect" and has then looked to its rights under the contract. It is difficult to imagine that Congress intended otherwise. By requiring the parties to continue the contract on pain of committing an unfair labor practice, Congress must have expected the parties to be able to enforce all of their rights under the contract. That is all that the Union seeks to do in this suit.

The dissent contends that the National Labor Relations Board has rejected a construction of § 8(d)(4) that gives effect to its explicit requirement that a contract is extended for sixty days when modification or termination is attempted in the absence of a timely (d)(1) notice. I have found no decision of the Board that has squarely faced the issue, *i.e.,* that has had to consider whether a contract remained in effect for sixty days after a purported termination not preceded by a timely (d)(1) notice.[5] What the Board has held in a line of cases is that when a contract is automatically renewable unless a contractually specified notice is given, the lack of the statutory notice specified in (d)(1) does not have the effect of triggering a full year of renewal. See *Jet Line Products, Inc.,* 229 N.L.R.B. 322 (1977); *General Maintenance Service Co.,* 182 N.L.R.B. 819, 822 n.9 (1970); *International Harvester Co.,* 77 N.L.R.B. 242 (1948).

There remains for consideration the relevant time period during which (d)(4) extends the contract as to SNH when a timely (d)(1) notice has not been given. SNH contends that since § 8(d)(4) purports to extend the contract for sixty days after the (d)(1) notice or sixty days after the contract expiration date, whichever is later, a literal reading of the statute could keep the contract in existence for years after its expiration date until the employer finally got around to giving notice of termination. However, a literal application of the phrase "whichever is later" has long since been rejected by both the Supreme Court, *NLRB v. Lion Oil Co.,* 352 U.S. 282, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957), and the National Labor Relations Board, *United Packinghouse Workers of America,* 89 N.L.R.B. 310 (1950). *Lion Oil* and *Packinghouse Workers* both involved a proposed mid-term modification or termination prior to the contract's expiration date. As long as a timely (d)(1)

---

ing the contract-extending provision of (d)(4). If the language refers to (d)(4), then it does suggest that courts cannot consider contracts extended as (d)(4) in terms provides; such a suggestion is at best dictum since the giving of a timely (d)(1) notice in *Procter & Gamble* precluded any claim that a (d)(4) extension had occurred.

**5.** I acknowledge that in *United States Gypsum Co.,* 90 N.L.R.B. 964, 968 n.11 (1950), the Board stated that § 8(d) is "inapplicable" where no

strike or lockout has occurred. That observation may be correct from the perspective of an agency determining whether an unfair labor practice has occurred but it is incorrect if it was intended to apply in the context of a case such as this where it is critical to determine whether a contract, with its authority for arbitration, continues in existence for a brief interval as specified in § 8(d)(4) after an attempted termination not preceded by a timely notice as required by § 8(d)(1).

notice was given, the effect of (d)(4) was to keep the contract in force only during the sixty-day interval after the notice, and not until the original expiration date of the contract. In *Packinghouse Workers* the Board observed that the "later" language of (d)(4) refers to a case where the sixty-day notice is given *"less* than 60 days before the termination." 89 N.L.R.B. at 316 (emphasis original). As an example, the Board posited a case where notice is given only thirty days before termination; in that event, the sixty-day period runs until thirty days beyond the expiration date, *i.e.,* "later" than expiration.

Thus, the effect of (d)(4) is as follows: If (d)(1) notice is given during the term of a contract, the contract continues for sixty days after the notice; if a party attempts to terminate at the expiration date specified in the contract, it can avoid any extension by giving (d)(1) notice sixty days prior to that date; if the party attempting to terminate at the expiration date gives less than sixty days' notice, the contract is extended beyond the expiration date only for the number of days that the notice is late; if the party attempting to terminate at or before the expiration date gives no (d)(1) notice at all, the logic of *Lion Oil* and *Packinghouse Workers* means that the contract is extended only sixty days beyond the original expiration date.[6] SNH's fear of a perpetual extension is a red herring.

With this understanding of § 8(d)(4), it is apparent that the arbitrator correctly relied upon the statute to find that the disputed discharge of an employee occurred at a time when the contract, with its broad arbitration clause, was still in effect. The earliest date when SNH contends it furnished the Union with any notice of proposed withdrawal from the Association was October 10, 1980.[7] In this case, the sixty-day periods of §§ 8(d)(1) and (4) are augmented to ninety days because health care employees are involved. § 8(d)(A), 29 U.S.C. § 158(d)(A). The 90th day after October 10, 1980 was January 8, 1981, which is the earliest date when the contract could have terminated as to SNH. The disputed discharge for which arbitration was sought occurred on January 7, 1981. The grievance was therefore governed by a contract then in effect and was arbitrable pursuant to the contract; the demand for arbitration, though made after expiration of the contract, was made within a "reasonable time" after the contract's expiration, *Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionery Workers Union, AFL–CIO,* 430 U.S. 243, 255 n. 8, 97 S.Ct. 1067, 1074 n. 8, 51 L.Ed.2d 300 (1977).[8] For these reasons, I concur in affirming the judgment that confirmed the arbitrator's award.

LUMBARD, Circuit Judge, dissenting:

I would reverse the judgment of the district court and vacate the award of the arbitrator; Sheepshead Nursing Home was under no obligation to arbitrate Bennett's discharge. The agreement, which included an arbitration provision, became null and void as to Sheepshead Nursing Home on October 31, 1981. The arbitration provision could have no after-life to require arbitra-

---

**6.** All of these results are those required only by § 8(d)(4); the contract itself may contain its own clauses covering extensions in the event of attempted mid-term or end-of-term modification or termination.

**7.** The Union contends that it never received any notice. In a post-argument letter to this Court, SNH calls our attention to a Memorandum of Decision of Judge Constantino in a case between the same parties involving the arbitrability of another grievance. *Sheepshead Nursing Home v. Ottley,* CV–82–0815 (E.D.N.Y. Apr. 27, 1982). That opinion refers to letters of SNH annexed to its papers filed in the Eastern District litigation. Inspection of that file re-

veals a copy of a letter dated October 10, 1980, from SNH to the Union somewhat equivocally indicating an intention to terminate the contract because of SNH's proposed withdrawal from the Association on October 30, 1980. Whether or not that notice complied with § 8(d)(1) and whether or not it was received by the Union, it is the earliest document referred to by SNH (however obliquely) that is claimed to be notice to the Union of contract termination.

**8.** I agree with Chief Judge Feinberg that whether the demand for arbitration was timely under the contract was an issue for the arbitrator.

tion of a discharge which occurred thereafter on January 7, 1982.

Sheepshead Nursing Home was a member of the Greater New York Health Care Facilities Association, Inc., a multi-employer group, which, on April 1, 1978 signed a contract with Local 144, for three years ending March 31, 1981. The contract is an elaborate, carefully drawn 39-page agreement; Section 32 of which allowed any member of the Association to withdraw and free itself of any contractual obligation in these words:

### 32. INDEPENDENT CONTRACTS

If the membership in the Association of any nursing home consenting hereto is terminated for any reason whatsoever, this agreement shall become null and void to such Employer.

Neither in Section 32 or elsewhere is there any requirement that an employer give any notice of withdrawal. The only notice requirement (Section 33) is that the Association give 24-hour notice to the Local if it chooses to terminate the contract as to all employers after March 31, 1981.

On October 10, 1980 Sheepshead sent a letter to Peter Ottley, president of Local 144, advising the union that it was withdrawing from the Association effective October 31, 1981 and that by its terms the contract would then be null and void as to Sheepshead. It concluded: "We hereby recognize our obligations toward your labor organization and seek a discussion for the purpose of executing a new collective bargaining agreement." By letter of November 3, 1980 Sheepshead repeated its willingness to bargain; to which the union made no response.

On January 7, 1981, sixty-nine days after its withdrawal from the Association, Sheepshead discharged Trevor Bennett, an employee and union shop steward. Although section 8(H) of the contract required the union to file its grievance within 15 days of the discharge, the union did not demand arbitration until February 12, 1981.

Sheepshead, contending that there was no longer any obligation to arbitrate such a dispute, moved in the New York Supreme Court, on March 2, 1981, to stay arbitration. The union moved the case to the district court where, on June 9, 1981, Judge Cannella denied a stay. He read the Supreme Court's decision in *Nolde Brothers, Inc. v. Local 358*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977) as holding that all postcontract grievances are arbitrable so long as the request for arbitration is filed within a reasonable time—a sweeping rule of law which goes beyond anything suggested in the three opinions we filed today. After filing a notice of appeal from Judge Cannella's ruling, Sheepshead withdrew its appeal without prejudice because of the rule in this circuit that the denial of a stay of arbitration is not appealable. *Greater Continental Corp. v. Schechter*, 422 F.2d 1100 (2d Cir. 1970).

When arbitration commenced, Sheepshead argued to the arbitrator that he lacked jurisdiction to hear the case. The arbitrator, however, ruled that he did have jurisdiction because the employer had failed to give notice of termination as required by § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d) (1976), and that accordingly the contract continued in effect.[1]

On this appeal, the dispositive question is whether the district court should have stayed arbitration. Under the terms of the contract, the employer could withdraw from the Association. When it did so, the contract became null and void as to the withdrawing employer. On its face, the contract required no notice of withdrawal and no one in this case—not Judge Cannella, not the arbitrator, and neither of my colleagues—has held that the contract *does* require any specific period of notice. Indeed, no one in this case has held that the contract under its own provisions continued to bind Sheepshead once Sheepshead's withdrawal rendered the contract null and void as to it. If null and void mean anything, it

---

1. Sheepshead also protested to the arbitrator that the Union failed to file its grievance within 15 days of the discharge, as required by § 8(H) of the contract. The arbitrator did not even mention this contractual limitation in his decision.

means that nothing under the contract survived, including the § 8 grievance procedures of the contract.

I would hold that the duty to arbitrate survives termination of a contract only as to rights vesting or grievances which had occurred before the contract was terminated. The Supreme Court in *Nolde Bros.*, in holding that the employer's duty to arbitrate survived termination of the contract, relied heavily on the fact that the union there sought to arbitrate vested rights. Our decisions go no further. Both *McAllister Bros., Inc. v. A & S Transportation Co.*, 621 F.2d 519 (2d Cir. 1980) and *Rochdale Village, Inc. v. Public Service Employees Union*, 605 F.2d 1290 (2d Cir. 1979) ordered arbitration of matters which concerned rights and events pre-dating termination of the respective contracts.

My colleagues are of the view that somehow the arbitration provision of the contract survives though the rest be null and void. Viewed realistically, their opinions are testimony to the fact that, in this circuit, once a district judge sends a case to arbitration, the court of appeals will do almost anything to uphold the arbitrator's award—thus making not only the arbitrator's award, but the district judge's decision, effectively unreviewable.[2]

Chief Judge Feinberg would hold that the duty to arbitrate continues indefinitely after termination so long as a "colorable claim" can be made that the termination was not successful. I find no authority for the "colorable claim" standard. We do not enforce other contracts merely because litigants make a "colorable claim" that the contracts are in force, and the Chief Judge gives no reason why we should enforce arbitration agreements upon such a slim reed. As matters now stand in this circuit, Local 144 could wait an unlimited period of time

to bring its "colorable claim" that the contract was not terminated, and it could *still* force arbitration. *See International Union of Op. Engineers v. Flair Builders, Inc.*, 406 U.S. 487, 491–92, 92 S.Ct. 1710, 1712–1713, 32 L.Ed.2d 248 (1972).

Judge Newman, while concurring in the "colorable claim" standard, also adopts the arbitrator's ruling that Sheepshead's failure to give notice under § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d) (1976), kept in effect the contract to arbitrate. In my view, § 8(d) has no application to this discharge case. Section 8(d) states that a labor contract continues "without strike or lockout" for 90 days after notice that a contract has been terminated. But § 8(d) regulates unfair labor practices, not contracts. Both the National Labor Relations Board, *see United States Gypsum Co.*, 90 N.L.R.B. 964, 968 n. 11 (1950), and this court, *see Procter & Gamble Independent Union v. Procter & Gamble Mfg. Co.*, 312 F.2d 181, 189 (2d Cir. 1962), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963), have indicated that failure to give notice under § 8(d) does not extend contractual obligations. The Supreme Court, though it has not ruled on this precise question, has held that a union may strike *during a contract* notwithstanding § 8(d). *NLRB v. Lion Oil Co.*, 352 U.S. 282, 77 S.Ct. 830, 1 L.Ed.2d 331 (1957). *Lion Oil* reasoned that § 8(d) neither creates a contractual duty to strike, nor creates a contractual duty to bargain. Those duties must be found in the contract; the statute does not put them there. *Id.* at 290–91, 77 S.Ct. at 334–335. Thus, it follows that § 8(d) creates no contractual duty to give notice of termination.

We have no authority to enforce violations of § 8(d). *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). So long as a

---

**2.** Chief Judge Feinberg's opinion shows the difficulty in obtaining review of the district judge's decision to send the matter to arbitration. Part II of his opinion commences by questioning whether the *arbitrator* abused his discretion and concludes that *Judge Cannella* was correct in sending the matter to the arbitrator. The issue in this case—when does the duty to arbitrate terminate?—is dealt with only

by an aside that the union must assert a "colorable claim" that the contract is still in force in order to compel arbitration. Neither the district court nor the arbitrator found the union had made such a "colorable claim" under the contract, as both imposed the duty to arbitrate on non-contractual legal theories—*Nolde Bros.* and § 8(d), both of which, in my opinion, have no application here.

contract provides for termination without notice, an employer may terminate and the next day fire all its employees, so far as its contractual obligations are concerned. The employer may have violated § 8(d) but it is not liable for damages. If it cannot be forced to pay damages for breach of contract, how can it be required to go to arbitration under the contract? If Sheepshead could fire its employees after October 31, 1980, without liability under the contract, how can it be required thereafter to arbitrate a grievance which did not occur until after that date?

Our deference to arbitrators has gone beyond the bounds of common sense. I cannot understand the process of reasoning by which any court can leave to the unfettered discretion of an arbitrator the determination of whether there is any duty to arbitrate. I am even more mystified that a court could permit such unrestrained power to be exercised by the very person who will profit by deciding that an obligation to arbitrate survives, thus ensuring his own business. It is too much to expect even the most fair-minded arbitrator to be impartial when it comes to determining the extent of his own profit. We do not let judges make decisions which fix the extent of their fees, *see Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). How, then, can we shut our eyes to the obvious self-interest of an arbitrator? *See* Paul R. Hays, *Labor Arbitration, A Dissenting View* 52 (1966).

It has become the fashion for courts to encourage and foster the use of arbitration as a more expeditious and inexpensive means of settling disputes, particularly as the pressure of mounting judicial caseloads is thereby reduced. No one can doubt that the public interest is generally served when parties to disputes agree upon such means for their resolution. But if a simple and clear agreement, such as we have here, is construed to impose an obligation without limit of time, contrary to what any sensible employer would suppose, prudent employers will resist agreeing to arbitration in any form. Nor does it promote the salutary

cause of arbitration for a court to enforce an award by an arbitrator, no matter how wrongheaded—to "stand idly by and let [the] court system be used as the handmaiden" of arbitration. P. Hays, *Labor Arbitration, supra,* at 118.

I had thought that our refusal to hear an appeal from a denial of a stay of arbitration is based on the belief that meaningful view may later be obtained, if necessary, upon the proceeding to confirm the award. *Greater Continental Corp., supra,* 422 F.2d at 1102; *see* Note, *Interlocutory Appeal of Orders Granting or Denying Stays of Arbitration,* 80 Mich.L.Rev. 153, 165, 172 (1981) (orders denying stays of arbitration do not threaten irreparable harm and therefore do not warrant immediate appeal). But if arbitrators' decisions are immune from review, as my colleagues' opinions suggest, then we should reconsider *Greater Continental Corp.* and allow immediate appeal from denials of stays.[3] This case indicates that if parties cannot challenge arbitrability before arbitration occurs, they will never get meaningful review.

I would reverse and vacate the arbitration award.

---

**3.** The Ninth Circuit allows appeals from denials of stays. *See Power Replacements, Inc. v. Air*

*Preheater Co.,* 426 F.2d 980, 982–83 (9th Cir. 1970).